UNION OF NEEDLETRADES, INDUSTRIAL AND TEXTILE EMPLOYEES, AFL–CIO, CLC, Plaintiffs,

v.

UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE Defendants.

No. 00 CIV.2417.

United States District Court, S.D. New York.

May 24, 2002.

Allison Rosenberg, Muzaffar A. Chishti, Union of Needletrades, Industrial and Textile Employees, Immigration Project, New York, NY, Ranjana Natarajan, Washington Square Legal Services, Inc., New York, NY, for plaintiff.

Edward Scarvalone, U.S. Attorney's Office, S.D.N.Y., New York, NY, for defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Union of Needletrades, Industrial and Textile Employees, AFL–CIO, CLC ("UNITE") brought this action pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") seeking an order directing defendant United States Immigration and Naturalization Service (the "INS") to comply with UNITE's FOIA request for disclosure of certain documents. Several months after UNITE's commencement of this action, the INS released most of the documents at issue. The parties thereafter resolved between them the disclosure of additional material and the Court conditionally discontinued the case. UNITE thereafter sought to reopen the matter to address its request for attorney's fees, which the INS refused to settle. UNITE argues that, under FOIA, it is entitled to collect such fees from the INS under the circumstances present in this case. For the reasons discussed below, the Court denies UNITE's request.

### FACTS

UNITE asserts that this litigation and the FOIA request upon which it is based are part of UNITE's response to the INS's policy of conducting workplace raids in search of illegal immigrants. According to UNITE, its union members and other immigrant workers have reported abuses against suspected aliens, and other forms of unlawful practices by INS officers during such raids. To protect its members' rights, defend those arrested and ensure the INS's compliance with laws and procedures governing such practices, UNITE sought information from the INS following workplace raids. UNITE contends that the INS relies on explicit ethnic and racial considerations in selecting sites. On occasions when the INS has not voluntarily released requested documents, UNITE has demanded them pursuant to FOIA.

The raid that gave rise to the case at hand occurred at Poly Pak Industries Inc. ("Poly Pak"), a UNITE garment factory, on November 16, 1998. By letter dated May 5, 1999, UNITE requested that the INS release all documents in its possession relating to the Poly Pak raid. On August 18, 1999, the INS denied the request. It contended that rejection was justified pursuant to 5 U.S.C. § 552(b)(7)(A) on the ground that the INS was then conducting an investigation of Poly Pak preliminary to enforcement proceedings. This decision, on UNITE's appeal, was affirmed on September 16, 1999 by the Office of Information and Privacy of the United States Department of Justice. UNITE commenced action in this Court on March 30, 2000 seeking an order to compel the INS to comply with UNITE's FOIA request. On August 31, 2002, coinciding with what the INS asserts was the conclusion of its enforcement action against Poly Pak, the INS responded to UNITE by releasing a substantial number of documents in full—over thirteen hundred pages by UNITE's account—but redacting some and withholding others, in this connection asserting exemptions pursuant to 5 U.S.C. §§ 552(b)(5), 552(b)(7)(c) and 552(b)(7)(E).

The INS answered UNITE's complaint on September 11, 2000. For several months thereafter the parties negotiated the sufficiency of the INS's responses. These discussions prompted the INS to release five additional pages of documents on April 17, 2001. At that point, the parties informed the Court that the substantive issues in dispute had been resolved and that only the matter of attorney's fees remained unsettled and under continuing discussions. Accordingly, the Court directed that the case be conditionally discontinued, subject to its being reopened

upon UNITE's application in the event settlement was not effectuated within sixty days.

At a conference with the Court held on June 29, 2001 the parties reported having reached an impasse concerning the counsel fees issue. The INS then argued that, as a matter of law, UNITE was not entitled to recover attorney's fees from the INS by reason of the recent Supreme Court decision in *Buckhannon Board and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources*, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). The Court requested supplemental briefs from both parties addressing the applicability of *Buckhannon* to the circumstances at hand. In its responsive papers, UNITE argues that *Buckhannon* is inapposite. The INS counters that *Buckhannon* does apply, and that regardless, UNITE cannot recover fees because it cannot establish the requisite causal relationship between the commencement of its lawsuit and the INS's production of documents. The INS also claims that its initial rejection of UNITE's request was legally permissible under FOIA's exemptions.

## BACKGROUND

Interpreting a statute, ordinarily a rigorous challenge in itself, is uniquely delicate when the task requires the court to march to the beats of different drummers. For a federal district court, the first note to be heard is that of Congress, which conceives and enacts the law. Ordinarily, Congress' meaning and purpose, as conveyed by the plain words of the statute on its face, should be controlling. Not always, however, is legislation written in living colors; so at times its intent must be gleaned from the meaning of words drawn in chiaroscuros.

Beyond congressional expressions are the relevant interpretations of the Supreme Court. Its mandate may take various forms— as decisions precisely on point, as analogous holdings, as germane dictum where all else fails, or as combinations of these sources. Next in order is the governing doctrine of the Circuit Court. Adherence to an appellate court ruling may pose especially sensitive issues in cases where a pertinent opinion of the Supreme Court, even if expressed as arguable dictum, may throw the Particular Court of Appeals statutory interpretation into question.

Underlying these higher legislative and judicial pronouncements, whether present or absent, the court always owes a measure of independent fealty to its own reading of the plain meaning of words used in the statutes, as well as to the inexorable logic that other sources— history, precedent, semantics, logic, reason— together compel as the intended course of the law. This case presents the interplay of these intricacies, which the Court confronts below.

## DISCUSSION

### A. FEE–SHIFTING STATUTES

■ A starting point for consideration of a litigant's claim of entitlement to recover attorney's fees is the "American Rule." As articulated by the Supreme Court, the rule holds that "the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the loser." *Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *see also Ruckelshaus v. Sierra Club*, 463 U.S. 680, 683–84, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983); *Buckhannon*, 532 U.S. at 602, 121 S.Ct. 1835. In applying this doctrine, the Supreme Court has followed "a general practice of not awarding fees to a prevailing party absent explicit statutory authority."

*Buckhannon,* 532 U.S. at 602, 121 S.Ct. 1835 (quoting *Key Tronic Corp. v. United States,* 511 U.S. 809, 819, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994)).

As exceptions to the American Rule, Congress has enacted over 150 statutes containing "fee-shifting" provisions that authorize courts to award attorney's fees to one of the litigants. *See Ruckelshaus,* 463 U.S. at 684, 103 S.Ct. 3274. But the wording of these provisions is not uniform. Rather, in conferring such authority, Congress has employed several formulations according to varying circumstances and with differing scopes of judicial latitude. *See Alyeska Pipeline,* 421 U.S. at 262, 95 S.Ct. 1612.

In some statutes the award of counsel fees is mandatory if the plaintiff "finally prevails." *See, e.g.,* 7 U.S.C. § 18(f) (the Commodity Exchange Act) ("If the petitioner finally prevails, he shall be allowed a reasonable attorney's fee . . . ."); 7 U.S.C. § 210(f) (Packers and Stockyards Act); 7 U.S.C. § 499(g)(b) (Perishable Agricultural Commodities Act).

Under the statutes at issue in *Buckhannon*—the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101 *et seq.,* and the Fair Housing Amendment of 1988 (the "FHAA"), 42 U.S.C. § 3601 *et seq.*—as well under several other laws on which similar provisions were modeled,[1]

the phrase Congress employs in the fee-shifting provision is "prevailing party." Consequently, the courts' authority is discretionary. *See, e.g.,* 42 U.S.C. § 3613(c)(2) (the "FHAA") ("[T]he court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee and costs"); 42 U.S.C. § 12205 (the "ADA") ("[T]he court . . ., in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs").[2]

In other statutes, such as FOIA, the fee-shifting exception is limited to parties who "substantially prevailed." *See* FOIA, 5 U.S.C. § 552(a)(4)(E) ("The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed."); *see also* 5 U.S.C. §§ 552a(g)(2)(B) (Privacy Act); 5 U.S.C. § 552b(i) (the "Government in the Sunshine Act"); 15 U.S.C. § 16 (Clayton Act)[3]; 16 U.S.C. § 470w–4 (National Historic Preservation Act); 42 U.S.C. § 11113 (Health Care Quality Improvement Act); 42 U.S.C. § 300aa–31(c) (National Vaccine Injury Compensation Program).

In a permutation combining the wording of two of these provisions, some statutes permit fee-shifting awards to "any prevailing or substantially prevailing party."

---

1. *See* 42 U.S.C. § 1988 (Civil Rights Attorney's Fees Award Act of 1976); *see Hanrahan v. Hampton,* 446 U.S. 754, 758 n. 4, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (*per curiam*) (noting that the counsel fees provision of § 1988 was patterned upon those contained in Titles II and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a–3(b) and 2000e–5(k), and § 402 of the voting Rights Act Amendments of 1975, 42 U.S.C. § 1973*l* (e)).

2. Some mandatory fee-shifting provisions, however, employ the term "prevailing party". *See, e.g.,* 15 U.S.C. § 15 (Clayton Act) (pertaining to suits for money damages); 5 U.S.C.

§ 504(a)(1) ("An agency that conducts an adversary adjudication shall award, to a prevailing party . . . fees and other expenses incurred . . . ."); *see Ruckelshaus,* 463 U.S. at 702 nn. 11–12, 103 S.Ct. 3274 (Stevens, J., dissenting).

3. Unlike FOIA's attorney's fees provision, the fee-shifting authority conferred with respect to actions for injunctive relief under § 16 of the Clayton Act is mandatory: "In any action [under § 16] in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff." 15 U.S.C. § 26.

See, e.g., 33 U.S.C. § 1365(d) (the Clean Water Act); 18 U.S.C. § 1864(e) (Supp.II) (same); 29 U.S.C. § 1370(e)(1) (Employee Retirement Income Security Act) (authorizing attorney's fees to a party "who prevails or substantially prevails"); 25 U.S.C. § 640d–27(b) (same); see also 26 U.S.C. § 7430(c)(4)(A) (Internal Revenue Code) (defining "prevailing party" as one who has "substantially prevailed.").

Another formulation requires a litigant to be "successful" in order to be eligible for an award of attorney's fees. See, e.g., 12 U.S.C. § 2607(d)(2) (Real Estate Settlement Procedures Act) ("In any successful action to enforce the liability under this paragraph, the court may award the court costs of the action together with a reasonable attorney's fee as determined by the court"); 12 U.S.C. § 3417(a)(4) (Right to Financial Privacy Act); 15 U.S.C. § 298(c)(Jewelers' Hall–Mark Act); 15 U.S.C. §§ 1681–1681t (Fair Credit Reporting Act).

In broader terms, the standard fixed in another group of fee-shifting provisions authorizes counsel fees without reference to parties or success "whenever [the court] determines that such an award is appropriate." See, e.g., 42 U.S.C. § 7607(f) (Clean Air Act); Ruckelshaus, 463 U.S. at 682–83 n. 1, 103 S.Ct. 3274 (noting that sixteen other federal statutes contain provisions for award of attorney's fees identical to § 307(f) of the Clean Air Act).

Finally, in contrast with the relatively undefined guidance offered by the preceding provisions, Congress in other contexts has narrowed the courts' latitude to award attorney's fees by detailed prescriptions that condition recovery of fees to the degree of relief the claimant obtained in the underlying litigation. See, e.g., 42 U.S.C. § 1997e(d)(B)(i) (Prison Litigation Reform Act of 1995) (directing that attorney's fees awarded to prisoners pursuant to 42 U.S.C. § 1988 be "proportionately related to the court ordered relief for the violation.").

## B. PRINCIPLES OF STATUTORY INTERPRETATION

■ The multiplicity and variety of these fee-shifting provisions raise basic questions concerning Congressional intent, as well as tensions among principles and approaches governing statutory construction. In applying these various terms, the Supreme Court has instructed that "similar attorney's fee provisions should be interpreted pari passu . . . ." See Ruckelshaus, 463 U.S. at 691, 103 S.Ct. 3274 (citing Northcross v. Memphis Bd. of Ed., 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973)); see also Buckhannon, 532 U.S. at 603 n. 4, 121 S.Ct. 1835 ("We have interpreted these fee-shifting provisions consistently . . . and so approach the nearly identical provisions at issue here.") (citing Hensley v. Eckerhart, 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("[t]he standards set forth . . . are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.' ")).

■ If identical or similar provisions are to be applied consistently, a question arises as to whether by employing varying terms Congress contemplated that each formulation would be governed by its own separate standard, or whether instead some overarching statutory purpose and common elements impliedly compel a uniform rule in some aspects of application despite textual variations in the statutes. This question introduces the interplay of several canons of statutory interpretation. First, absent unambiguous contrary expression, legislative provisions must be accorded the clear meaning of the ordinary language terms they employ. See Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd.

*P'ship,* 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (noting that in construing statutes, the Supreme Court assumes that Congress "intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.' ") (quoting *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)).

■ Secondly, when, by virtue of broad acceptance through custom and longstanding practice, words become legal terms of art, thus acquiring particular meaning in legal usage, they must be read in accordance with their legal connotation. *See Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."); *see also Buckhannon,* 532 U.S. at 615–16, 121 S.Ct. 1835 (*Scalia,* J., concurring).

■ A third cardinal doctrine of statutory interpretation here at play is the presumption that in all enactments every choice of words is purposeful, manifesting legislative intent to convey particular meaning, and that statutory use of different terms evinces intent to express different meanings. *See Legacy Emanuel Hosp. & Health Ctr. v. Shalala,* 97 F.3d 1261, 1265 (9th Cir.1996) ("[T]he use of different language by Congress creates a presumption that it intended the terms to have different meanings.") (citing *Washington Hosp. Ctr. v. Bowen,* 795 F.2d 139, 146 (D.C.Cir.1986)); 2A Norman Singer, Statutes and Statutory Construction

§ 46.06 (6th ed.2000) (noting that legislative "use of different terms within related statutes generally implies that different meanings were intended.") Courts therefore are obliged to give effect to every clause and word of a statute, *see United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955), and to avoid reading legislation in a way that renders some words altogether redundant, *see Gustafson v. Alloyd Co.,* 513 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995).

## C. THE PARTIES' DISPUTE

Against the backdrop of Congress's use of variable terms in different fee-shifting statutes and the pertinent judicial rules for deciphering legislative design, the parties' dispute before this Court squares off over the meaning of the phrase "substantially prevailing" as used in FOIA. UNITE argues that the words "prevailing party" as used in some statutes is not synonymous with "substantially prevailing" employed in others; whereas "prevailing party," as the *Buckhannon* Court found, *see* 532 U.S. at 603, 121 S.Ct. 1835, is a term of art defined in Black's Law Dictionary, no such specialized meaning can be ascribed to the phrase "substantially prevailing," which is not distinctly listed or identified as such in the latest edition of Black's Law Dictionary. In UNITE's reading, therefore, "substantial" serves to modify "prevailing," as defined by the Black's Law Dictionary edition in effect when Congress enacted FOIA's attorney's fee provision, to mean "essentially." *Black's Law Dictionary* 1597 (5th ed. rev.1968). The term thus would generally connote success in achieving a desired result, demanding a lesser degree of triumph than a judgment on the merits or other court-ordered disposition, and would authorize an award of attorney's fees to a party who obtains essentially the relief sought in the action.

The INS rejects UNITE's arguments, maintaining that any validity UNITE's interpretation may have, and the "catalyst theory" of recovery upon which it rests, were definitively repudiated by *Buckhannon.* Under the Supreme Court's reading of congressional intent expressed in comparable fee-shifting statutes, the INS contends, UNITE is not entitled to any award of attorney's fees in this case.

### D. *THE "CATALYST THEORY"*

UNITE's argument represents an expression of the "catalyst theory" that, until *Buckhannon,* served as controlling doctrine guiding court awards of attorney's fee applications under the various federal statutes authorizing such recovery. *See Buckhannon,* 532 U.S. at 601–602, 121 S.Ct. 1835. The theory rests on a reading of the word "prevail" in its ordinary sense to connote a triumph, achieving success or mastery "by virtue of strength or superiority." *Buckhannon,* 532 U.S. at 633, 121 S.Ct. 1835 (Ginsberg, J., dissenting) (quoting Webster's Third New International Dictionary 1797 (1976)). In this application, recognizing circumstances "where the ultimate goal is not an arbitrator's approval, but a favorable alteration of actual circumstance," *id.,* to "prevail" is outcome-driven. Regardless of the path by which some measure of success is attained, use of the term "prevailing" would allow recovery of counsel fees based on something less than a favorable judgment on the merits or consent decree, but only upon a causal showing that the plaintiff's litigation achieved the intended result of prompting a change in defendant's conduct to grant some or all of the practical relief plaintiff contemplated in bringing the action. *See Vermont Low Income Advocacy Council, Inc. v. Usery,* 546 F.2d 509, 513 (2d Cir. 1976) (holding that under FOIA as enacted, "a judgment is not an absolute prerequisite to [an attorney fee] award"); *Marb-*

*ley v. Bane,* 57 F.3d 224, 234 (2d Cir.1995) ("Victory can be achieved well short of a final judgment (or its equivalent) . . . ."); *see also Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978); *Parham v. Southwestern Bell Tel. Co.,* 433 F.2d 421 (8th Cir.1970); *Grano v. Barry,* 783 F.2d 1104, 1108–1110 (D.C.Cir.1986).

In *Vermont Low Income,* the leading Second Circuit case endorsing the catalyst theory, the court examined the legislative history of FOIA, which it found "unusually complete" and rejected the argument that the rendition of a plaintiff's judgment was a necessary condition for an award of attorney's fees and costs. *See Vermont Low Income,* 546 F.2d at 513. The Circuit Court concluded that to obtain such an award in a FOIA action, the plaintiff must show "that the prosecution of the action could reasonably have been regarded as necessary and that the action had substantial causative effect on the delivery of the information." *Id.* In so ruling, the court considered significant the prospect that the Government, on the eve of a defeat at a FOIA request trial, could subvert the purposes of the statute by tactical capitulation, "an eleventh hour tender of the information requested," as a means of aborting any award of attorney's fees. *Id.; see also Kopet v. Esquire Realty Co.,* 523 F.2d 1005, 1008–09 (2d Cir.1975); *Cuneo v. Rumsfeld,* 553 F.2d 1360, 1364 (D.C.Cir. 1977).

### E. *BUCKHANNON AND ITS IMPLI-CATIONS*

In this Court's view, *Buckhannon,* read in the context of *Ruckelshaus* and other cases discussed below, compels a rejection of UNITE's arguments. In *Buckhannon,* the West Virginia Office of Health Facility Licensure and Certification (the "OHFLC") ordered the closure of plaintiff Buckhannon Board and Care Home's resi-

dential care facilities for violation of state law. Buckhannon brought action in federal court seeking a judgment declaring the state statute at issue contrary to the federal FHAA and the ADA. Months into discovery and other pretrial proceedings, Buckhannon withdrew its claims for damages and the district court ruled that Buckhannon's claims for injunctive relief could proceed to trial. About one month later, the West Virginia legislature, at the behest of the OHFLC, repealed the challenged provision and the federal court declared Buckhannon's lawsuit moot.

Buckhannon, invoking the "prevailing party" provisions of the FHAA and ADA requested an award of attorney's fees. It argued that it was entitled to such recovery under the catalyst theory because its litigation had prompted the legislative response that provided the practical effect Buckhannon sought by instituting the federal action. The district court, citing the Fourth Circuit's holding in *S–1 and S–2 v. State Bd. of Educ. of N.C.*, 21 F.3d 49 (4th Cir.1994) (en banc), denied Buckhannon's application. In that case the Fourth Circuit, departing from every other Circuit Court that had adopted the catalyst theory, ruled that the operation of a lawsuit to induce change in a defendant's conduct was insufficient to entitle a plaintiff to an award of attorney's fees, and that to qualify as a "prevailing party" a litigant must obtain "an enforceable judgment, consent decree, or settlement." *Id.* at 51 (citing *Farrar v. Hobby*, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)).[4] The Supreme Court affirmed.

The Supreme Court held that "the 'catalyst theory' is not a permissible basis for the award of attorney's fees under the FHAA … and ADA …." *Buckhannon*, 532 U.S. at 610, 121 S.Ct. 1835. Factually, *Buckhannon* considered only statutes that authorize attorney's fees to the "prevailing party." In its articulation of the question before it the Court specifically narrowed the issue to whether "this term" includes a litigant who has failed to obtain a judgment or other judicially-ordered relief, but who nonetheless, by means of a lawsuit, has achieved some success in altering the defendant's conduct. *See Buckhannon*, 532 U.S. at 600, 121 S.Ct. 1835.

Finding that in those statutes Congress had employed language that constituted a legal term of art, the Supreme Court defined "prevailing party" as "one who has been awarded some relief by the court." *Id.* at 603, 121 S.Ct. 1835 (citing Black's Law Dictionary 1145 (7th ed. 1999) ("[A] party in whose favor a judgment is rendered …. Also termed *successful party*.") (emphasis in original)). Though the Court's ruling pertained to Congress' use of the term "prevailing party," the analysis in all three opinions suggests that the underlying debate had broader reach, and extended to different understandings of

---

4. More recently a Fourth Circuit panel in *Reinbold v. Evers*, 187 F.3d 348, 362 (4th Cir.1999), without reference to *S–1 and S–2*, applied the catalyst theory in the context of an application for attorney's fees filed under the fee-shifting provision of the Privacy Act, 5 U.S.C. § 552a(g)(1)(A), which contains the same "substantially prevailed" standard as FOIA. Curiously, that Circuit Court, in articulating the appropriate standard of review, twice made mention of "prevailing party." *Id.* ("If the district court denies a prevailing party's motion for attorneys' fees, we review such denial for abuse of discretion … However, if the district court determines, as a matter of law, that a party is not a prevailing party, we review the district court's determination *de novo*.") (citations omitted). Of course, *Reinbold* predates *Buckhannon*, so that it is not certain whether the Fourth Circuit would still follow its precedent. *But see Smyth v. Rivero*, 282 F.3d 268, 274–75 (4th Cir.2002) (applying *Buckhannon* in the context of a "prevailing party" claim for attorney's fees in an action brought under 42 U.S.C. § 1988).

the meaning of "prevailing" or "to prevail" as used in a legal context encompassing various fee-shifting statutes. Noting that Congress had authorized attorney's fees to the "prevailing party" in many statutes in addition to those at issue before it, the *Buckhannon* Court cited to *Marek v. Chesny*, 473 U.S. 1, 43–51, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985) (Appendix to opinion of Brennan, J., dissenting), which lists 116 statutes containing various fee-shifting provisions. *See Buckhannon*, 532 U.S. at 602–03, 121 S.Ct. 1835. The Court then noted that "[w]e have interpreted these fee-shifting provisions consistently . . . and so approach the *nearly identical* provisions here." *Id.* at 603 n. 4, 121 S.Ct. 1835. (emphasis added). By referencing these numerous statutes together and mentioning that their fee-shifting provisions were "nearly" identical to those before it, the Court implicitly acknowledged that, in fact, the language of the statutes varied and that the Court nonetheless interpreted their provisions "consistently." *Id.*

From among various definitions of the notion of "prevailing" the majority settled on the one most narrowly applicable to the context of litigation and which demands judicially-ordered relief on the merits. In so deciding, the Court reiterated that " '[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail.' " *Id.* at 603, 121 S.Ct. 1835 (quoting *Hewitt v. Helms*, 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987)). In his concurrence, Justice Scalia characterized the Court's conclusion by stating that "a party cannot be deemed to have prevailed, *for the purposes of fee-shifting statutes such as* 42 U.S.C. §§ 1988, 3613(c)(2)" absent an enforceable judicial determination. *Id.* at 622, 121 S.Ct. 1835 (emphasis added) (Scalia, J., concurring). In this regard, Justice Scalia

added that "[o]ne does not prevail in a suit that is never determined." *Id.* at 620, 121 S.Ct. 1835 (Scalia, J., concurring). And Justice Ginsberg's opinion for the dissenters observed that after the Fourth Circuit broke ranks by abandoning the catalyst theory, "nine Courts of Appeals [sic] reaffirmed their own consistently held interpretation of the term 'prevail.' " *Id.* at 627, 121 S.Ct. 1835.

In reviewing its prior precedents, the Court acknowledged language in earlier cases supporting arguments both favorable and unfavorable to the catalyst rule. *See id.* at 627 n. 5, 121 S.Ct. 1835. In the final analysis, however, the Court concluded that "[w]e have *only* awarded attorney's fees where the plaintiff has received a judgment on the merits . . . or obtained a court-ordered consent decree . . . ." *Id.* at 605, 121 S.Ct. 1835 (citations omitted)(emphasis added). The Court majority underscored the fact that it has *"[n]ever* awarded attorney's fees for a nonjudicial 'alteration of actual circumstances' " and chided the dissenters for seeking to expand prior precedents and "abrogate the 'merit' requirement," so as to award attorney's fees in cases where a complaint presents a claim that may be nonfrivolous but nonetheless potentially meritless. *Id.* at 606, 121 S.Ct. 1835 (citation omitted)(emphasis added).

To avoid this prospect, the Court's ruling enunciated a standard that appears designed to promote certainty and efficiency and minimize the potential for abusive litigation, though effectively limiting the lower courts' discretion to award counsel fees. In this regard, the Court stated: "enforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." *Id.* at 604, 121 S.Ct. 1835 (quoting *Texas State Teachers*

*Assn. v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)).[5]

The *Buckhannon* Court's analysis thus thoroughly examined the catalyst theory in pointed language in which it is not difficult to discern reproach and repudiation whose implications must be felt in any review of other fee-shifting statutes. In so doing, the Supreme Court found several ways in which the doctrine fell short of the Court's articulated standards. First, it would allow an attorney's fee award "where there is no judicially sanctioned change in the legal relationship of the parties." *Id.* at 605, 121 S.Ct. 1835. On this point the Court noted that: "[a] defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." *Id.*

Second, the Court examined the legislative history of the statutes before it and found congressional intent "at best ambiguous as to the availability of the 'catalyst theory' *for awarding attorney's fees.*" *Id.* at 607, 121 S.Ct. 1835 (emphasis added). In view of the "American Rule" that attorney's fees may not be recovered absent explicit statutory authority, the Court concluded "such legislative history is clearly insufficient to alter the accepted meaning of the statutory term." *Id.* at 608, 121 S.Ct. 1835 (quoting *Key Tronic,* 511 U.S. at 819, 114 S.Ct. 1960).

Third, the Court expressed concern over the potentially coercive or abusive effects it associated with the catalyst theory. The rule, the Court noted, serves as a "disincentive" upon a defendant's decision to voluntarily change conduct that may not be illegal. *Id.* at 608, 121 S.Ct. 1835; *see also id.* at 617, 121 S.Ct. 1835 (Scalia, J., concurring) (noting that the catalyst theory supported by the dissent would produce an unreasonable result: "an award of attorney's fees when the merits of plaintiff's case remain unresolved—when, for all one knows, the defendant only 'abandon[ed] the fray' because the cost of litigation— either financial or in terms of public relations—would be too great.").

Finally, considering policy concerns, the Court reiterated, again in terms that appear to transcend the bounds of the catalyst theory's application to "prevailing party" statutes, that " '[a] request for attorney's fees should not result in a second

---

5. On this point, the Supreme Court's holding would exclude allowing attorney's fees following private settlements ending litigation. The Court acknowledged that dicta in prior opinions could be construed to permit such recovery, but retreated from such indications, declaring that "[p]rivate settlements do not entail the judicial approval and oversight involved in consent decrees." *Buckhannon,* 532 U.S. at 604 n. 7, 121 S.Ct. 1835. Nonetheless, some courts have read *Buckhannon* not to preclude an award of counsel fees in connection with private settlements where the parties' accord is incorporated into a judicial order in which the court retains jurisdiction to enforce the terms of the agreement. *See, e.g., Barrios v. California Interscholastic Fed'n,* 277 F.3d 1128, 1134 (9th Cir.2002); *see also Smyth,* 282 F.3d at 283–84; *New England Reg'l Council of Carpenters v. Kinton,* 284 F.3d 9 (1st Cir.2002); *Johnson v. District of Columbia,* 190 F.Supp.2d 34, 45 n. 3 (D.D.C.2002); *Johnny's IceHouse, Inc. v. Amateur Hockey Ass'n of Ill.,* No. 00–7363, 2001 WL 893840 (N.D.Ill. Aug.7, 2001); *National Coalition for Students with Disabilities v. Bush,* 173 F.Supp.2d 1272 (N.D.Fla.2001). The theory of these cases is that some court-ordered settlements may be functionally equivalent to consent decrees and thus bear the "judicial *imprimatur* on the change" in the parties' legal status that *Buckhannon* requires. *Buckhannon,* 532 U.S. at 605, 121 S.Ct. 1835. *But see J.C. v. Regional Sch. Dist. 10,* 278 F.3d 119, 125 (2d Cir.2002) (holding that administrative relief obtained by plaintiff arose from a federal statutory mandate and not from any change in defendant's conduct that entailed a judicially-sanctioned remedy).

major litigation.'" *Id.* at 609, 121 S.Ct. 1835 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). For this reason, the Court stressed, it had "avoided an interpretation of the *fee-shifting statutes* that would have 'spawn[ed] a second litigation of significant dimension.'" *Id.* (quoting *Garland*, 489 U.S. at 791, 109 S.Ct. 1486) (emphasis added). On this point, the Court noted that "catalyst theory" hearings require analysis of the defendant's subjective motivations in changing its conduct, an inquiry that is highly fact-intensive. *Id.* Although expressing confidence in the ability of the district courts to perform the nuanced analysis, the Court characterized the process as "clearly not a formula for 'ready administrability.'" *Id.* at 610, 121 S.Ct. 1835(quoting *Burlington v. Dague*, 505 U.S. 557, 566, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)).

In sum, however much the Supreme Court endeavored to confine its articulation of the precise question to the statutes before it, *Buckhannon* raises larger issues implicating other fee-shifting statutes. *See Bennett v. Yoshina*, 259 F.3d 1097, 1100 (9th Cir.2001) ("There can be no doubt that the Court's analysis in *Buckhannon* applies to statutes other than the two at issue in that case."). First, the Court appears to be addressing the lower courts' authority to award attorney's fees more broadly in circumstances in which Congress has not explicitly prescribed judicial action as a prerequisite for recovery of such fees. Second, there is substantial language in the case, reflected not only in the majority but also in the concurring and dissenting opinions, suggesting that the Court considered not just the term "prevailing party" but the concept of "prevailing" in the context of litigation. And third, *Buckhannon* may be understood not only as an interpretation of a legislative phrase but as a ringing rejection of a judicial doctrine which the term had broadly spawned as the controlling standard governing various fee-shifting provisions in eleven circuit courts for about twenty-five years.

In fact, post-*Buckhannon*, some Circuit Courts have already begun to dismantle the catalyst theory and compose what may be read as a requiem for the rule. Most of these decisions involve the "prevailing party" formulation in several statutes. *See, e.g., New York State Fed'n of Taxi Drivers, Inc. v. Westchester County Taxi and Limo. Comm'n*, 272 F.3d 154, 158 (2d Cir. 2001) (interpreting *Buckhannon* to hold that the catalyst theory was no longer a permissible basis for the award of attorney's fees under 42 U.S.C. § 1988); *Regional Sch. Dist. 10*, 278 F.3d at 124–125 (same with regard to 20 U.S.C. § 1415(i)(3)(B) (Individuals with Disabilities Act)); *Chambers v. Ohio Dep't of Human Servs.*, 273 F.3d 690, 693 n. 1 (6th Cir.2001) (42 U.S.C. § 1988); *Perez–Arellano v. Smith*, 279 F.3d 791, 794 (9th Cir. 2002) (same for 28 U.S.C. § 2412(d)(1)(A) (Equal Justice Act)); *Smyth*, 282 F.3d at 274–76 (42 U.S.C. § 1988).

Other cases, however, have held *Buckhannon* applicable to fee-shifting statutes containing the terms "substantially prevailed" and "successful" party. Especially on point is *Oil, Chemical and Atomic Workers International Union, AFL–CIO v. Department of Energy*, 288 F.3d 452 (D.C.Cir.2002). There, the Court of Appeals for the District Columbia held squarely that, absent compelling reason, eligibility for an award of attorney's fees in a FOIA case should be treated the same as under other fee-shifting statutes. In so ruling, the Circuit Court equated "prevailing party" and "a party who prevails" as synonymous and found "nothing to suggest that Congress sought to draw any fine distinction between 'prevailing party' and

'substantially prevail.'" *Id.* at 455. In *Crabill v. Trans Union, L.L.C.,* 259 F.3d 662, 666–67 (7th Cir.2001), the Seventh Circuit applied *Buckhannon* to a claim for counsel fees in a case involving the "successful" party fee-shifting provision of the Fair Credit Report Act, 15 U.S.C. § 1681–1681t. The Circuit Court there noted that *Buckhannon* emphasized the similarity of most federal fee-shifting statutes. *Id.; but see Center for Biological Diversity v. Norton,* 262 F.3d 1077, 1080 n. 2 (10th Cir.2001)(declining to apply *Buckhannon* and adhering to the catalyst rule in a counsel fees application under the "when appropriate" standard of the Endangered Species Act, 16 U.S.C. § 1540(g)(4)); *Brickwood Contractors, Inc. v. United States,* 49 Fed. Cl. 738, 744 (2001) (limiting *Buckhannon* to the particular statutes cited by the Supreme Court).

## F. EFFECTS OF RUCKELSHAUS AND EARLIER CASES

If questions persist as to whether the catalyst theory survived the *Buckhannon* Court's onslaught, so as to claim continued vitality in other federal fee-shifting statutes, any doubts may be put to rest by the fatal nails two earlier Supreme Court precedents drove into the faulty logic of the argument.

In *Farrar,* the Court ruled that to qualify as a prevailing party a plaintiff must achieve at least some success on the merits, even if only nominal, reduced to an enforceable judgment against the defendant from whom counsel fees are sought. *See Farrar,* 506 U.S. at 111, 113 S.Ct. 566. The Court noted that a plaintiff "prevails" when actual relief on the merits of his claim "materially alters the legal relation-ship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff," and that such material alteration occurs only when the plaintiff becomes entitled to enforce a judgment. *Id.* at 111–112, 113 S.Ct. 566. This decision prompted some Circuit Courts to abandon or question the viability of the catalyst theory. *See S–1 and S–2,* 21 F.3d at 51; *Foreman v. Dallas County,* 193 F.3d 314, 320 (5th Cir.1999) (noting that "[a]fter *Farrar* … the continuing validity of the catalyst theory is in serious doubt.").[6] In fact, the *Buckhannon* Court, citing *Farrar,* noted that "[w]e have only awarded attorney's fees where the plaintiff has received a judgment on the merits" or a court-ordered consent decree. *Buckhannon,* 532 U.S. at 605, 121 S.Ct. 1835.

In *Ruckelshaus,* plaintiffs, the Environmental Defense Fund and the Sierra Club, challenged the federal Environmental Protection Agency's ("EPA") sulfur dioxide emission standards governing coal-burning power plants. The District of Columbia Circuit rejected all of the plaintiffs' claims, but nonetheless granted their application for an award of attorney's fees pursuant to § 307(f) of the Clean Air Act, 42 U.S.C. § 7607(f). The Circuit Court, applying a provision that authorized recovery of counsel fees "whenever [the court] determines that such an award is appropriate," found that it was "appropriate" for plaintiffs to obtain the relief they requested for their contributions towards promoting the goals of the Clean Air Act. *See Ruckelshaus,* 463 U.S. at 681–82, 103 S.Ct. 3274. The Supreme Court reversed.

In a passage that portends its ruling in *Buckhannon,* the Supreme Court concluded that:

---

**6.** Other Circuits, noting that the issue was not presented in *Farrar,* concluded that *Farrar* did not repudiate the catalyst theory. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*

528 U.S. 167, 194, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)(citing cases supporting this assertion).

the language of the section, read in the light of the historic principles of fee-shifting in this and other countries, requires the conclusion that *some success on the merits* be obtained before a party becomes eligible for a fee award under § 307(f).

*Id.* at 682, 121 S.Ct. 1835 (emphasis added).

*Ruckelshaus,* as amplified by *Buckhannon,* bears on the issue now before this Court in several ways. As context, the Supreme Court had also just ruled that under the "prevailing party" standard contained in the civil rights statutes, when litigation entails distinct claims for relief based on different facts and legal theories, some of which achieve results and others not, "no fee may be awarded for services on the unsuccessful claim." *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In *Ruckelshaus,* the Supreme Court in essence extended this principle to other fee-shifting provisions. First, the Court appears to address generally the issue of attorney's fee authority conferred by the various federal statutes. In particular, the *Ruckelshaus* Court references the "more than 150 existing federal fee-shifting provisions" and notes that virtually every one of them "predicates fee awards on *some* success by the claimant." *Id.* at 684, 103 S.Ct. 3274 (emphasis in original). The Supreme Court also observed that while the statutes

contain varying standards as to the precise degree of success necessary for an award of fees—— such as whether the fee claimant was the "prevailing party" the "substantially prevailing" party, or "successful,"—— the consistent rule is that complete failure will not justify shifting fees from the losing party to the winning party.

*Id.*

Second, the Court examined the legislative history of § 307(f) and found it unpersuasive, just as the *Buckhannon* Court did with regard to the "prevailing party" fee-shifting provision before it, despite some language in congressional reports that the plaintiffs cited as support for their position. *See Ruckelshaus,* 463 U.S. at 686–92, 103 S.Ct. 3274.[7] The Court concluded that Congress' choice of the "when appropriate" standard as the measure for the courts' award of attorney fees "was meant to expand the class of parties eligible for fee awards from prevailing parties to *partially prevailing* parties—— parties achieving *some success,* even if not major success." *Id.* at 688, 103 S.Ct. 3274 (emphasis in original). By so doing, the Court continued, Congress intended to eliminate both the restrictive readings of "prevailing parties" the courts had adopted in some cases, as well as "the necessity for case-by-case scrutiny by federal courts into whether plaintiffs prevailed 'essentially' on 'central issues.'" *Id.*

On the basis of this review of the legislative history, the Supreme Court reached two conclusions pertinent to this Court's inquiry in the case at hand: (1) that adop-

---

**7.** The House Report on § 307(f) contained a passage stating that the purpose of the attorney's fees provision was not only to discourage frivolous litigation, "but also to encourage litigation which will assure proper implementation and administration of the act or otherwise serve the public interest. *The committee did not intend that the court's discretion to award fees under this provision should be restricted to cases in which the*

*party seeking fees was the 'prevailing party.'* In fact, such an amendment was expressly rejected by the committee, largely on the grounds set forth in *NRDC v. EPA,* 484 F.2d 1331, 1388[sic] (1st Cir.1973)." *Id.* at 687, 103 S.Ct. 3274 (quoting H.R.Rep. No. 95–294, 95th Cong., 1st Sess. 337 (1977), U.S.Code Cong. & Admin. News 1977, p. 1416 (emphasis added in the Supreme Court's opinion)).

tion of the "when appropriate" standard "was intended to permit awards of fees to all *partially prevailing* parties," and (2) that "absent *some degree of success on the merits* by the claimant, it is not 'appropriate' for a federal court to award attorney's fees under § 307(f)." *Id.* at 691, 694, 103 S.Ct. 3274 (emphasis added). These observations are noteworthy and pertinent here because although § 307(f) purposefully does not employ the terms "prevailing" or "prevailing party," the *Ruckelshaus* Court's reading of the fee-shifting provision implicitly incorporates the concept of "prevailing" into the "when appropriate" test by instructing that a court cannot appropriately award attorney's fees to a litigant unless in fact that party has "prevailed" to some extent, and that the measure of that threshold is the degree of *success on the merits.*[8]

The Supreme Court's conclusion in *Ruckelshaus* that some *success on the merits* is a prerequisite for an award of attorney's fees to a litigant, even under a statute that does not mention the term "prevailing," serves as an underpinning for its holding in *Buckhannon* that a "prevailing party" is one "who has been awarded some relief by the court." *Buckhannon*, 532 U.S. at 603, 121 S.Ct. 1835. For in *Buckhannon* the Court reaffirmed that under its reading of the "prevailing party" fee-shifting provisions Congress intended to permit the award of counsel fees " 'only when a party has *prevailed on the merits* of at least some of his claims....' " *Buckhannon*, 532 U.S. at 603, 121 S.Ct. 1835 (quoting *Hanrahan v. Hampton*, 446 U.S. 754, 758, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (*per curiam*) (emphasis added)). To the same effect, the Court also reiterated that "[o]ur '[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail.' " *Id.* (quoting *Hewitt v. Helms*, 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987)).[9]

■ In synthesis, the implications of these cases seem inescapable. They instruct that, though interpreting statutes containing different fee-shifting formulations, the Supreme Court has construed the provisions consistently to embody some common elements. First is the no-

---

8. The dissenters in *Ruckelshaus* took issue with the majority on precisely this ground: "Today the Court holds that no matter how exceptional the circumstances may be, Congress intended such awards to be made only to prevailing parties. But in § 307(f) Congress deliberately used language that differs from the "prevailing party" standard, and it carefully explained in the legislative history that it intended to give the court of appeals discretionary authority to award fees and costs to a broader category of parties." *Id.* at 694, 103 S.Ct. 3274; *see also id.* at 702, 103 S.Ct. 3274 ("Nevertheless the Court today asserts that a statute which does not refer to 'prevailing parties' actually *does* refer to 'prevailing parties.' ") (emphasis in original).

9. The Supreme Court's repeated emphasis on the predicate that any relief for counsel fees awarded must be both judicially-sanctioned and "on the merits" invites consideration of the Court's understanding of that phrase, in particular the extent to which the term is meant to be coextensive with the principles governing "adjudication upon the merits" for the purposes of Federal Rules of Civil Procedure 41 and application of the doctrine of claim preclusion. *See* Fed.R.Civ.P. 41; *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 501–02, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001) (noting that "[t]he original connotation of an 'on the merits' adjudication is one that actually 'pass[es] directly on the substance of [a particular] claim' before the court", but that over the years the meaning of the term "judgment on the merits" has evolved, so as to now encompass some applications that do not entail passing upon the substantive merits of a claim); *see also Farrar*, 506 U.S. at 111, 113 S.Ct. 566; *Buckhannon*, 532 U.S. at 605, 121 S.Ct. 1835.

tion of "prevailing" or "to prevail," to which the Supreme Court, absent more explicit congressional mandate, attaches the meaning of the term as used in a legal context. The crux of this concept comprises two components. One relates to content, and requires some success by the claimant on the merits materially altering the behavior of the defendant to the benefit of the plaintiff. *See Hanrahan,* 446 U.S. at 758, 100 S.Ct. 1987; *Hewitt,* 482 U.S. at 755, 107 S.Ct. 2672; *Garland,* 489 U.S. at 792, 109 S.Ct. 1486.

The second aspect may be termed procedural. The claimant's prevailing status on the merits must be manifested in actual relief ordered by a court and incorporated in an enforceable judgment or consent decree. These requirements serve to record both the *fact* and the *degree* of the claimant's success on the merits, which in turn form the basis for the court's determination of the reasonable amount of attorney's fees to which the winning litigant may be entitled. Together, the two tests also document that the claimant's victory in fact did not issue from an act of sheer surrender by the defendant that would not reflect the actual role the litigation played in causing a material alteration of the defendant's conduct beneficial to the claimant. The use of different terms in the statutes to express these common elements, as the Supreme Court reads them, is that " 'prevailing party' is not the *only* way to impose a requirement of court-ordered relief." *Buckhannon,* 532 U.S. at 614, 121 S.Ct. 1835 (Scalia, J., concurring) (emphasis in original).

## G. *UNITE'S ARGUMENTS*

Under this Court's reading of *Buckhannon* and related cases, the distinction UNITE presents between the "prevailing party" language in the statutes *Buckhannon* considered and the term "substantial-

ly prevailing" employed in FOIA, must fail. First, putting aside for the moment the effect of the word "substantially," both formulations use the word "prevailing." That is the operative word, and not the mention of "party," from which the term of art, as the *Buckhannon* Court determined, derives its definition, and which then serves as the predicate for the corresponding statutory interpretation the Court enunciated. Consequently, in the light of *Ruckelshaus* and *Buckhannon,* the notion of a litigant "prevailing" for the purposes of the fee-shifting statutes must be understood to demand some success on the merits incorporated in a judgment or other judicial decree. Though, to be sure, there is doctrine instructing that Congress' use of different terms in different statutes signals intent to express different meanings, the invocation of general principle in this case cannot overcome the logic and implication of the Supreme Court's interpretation of "prevailing" in the context of fee-shifting provisions. Affixing a particular definition and corresponding procedural requirements to the term in one statute necessarily carries forward those baseline legal consequences to other provisions which employ that same word.

This conclusion is all the more compelling when the multiplicity of variations on the words "prevail" and "prevailing" that appear in the numerous fee-shifting statutes is considered. As described above, the concept of "prevailing" occurs formulated as "finally prevails;" "prevails or substantially prevails;" "substantially prevailed;" "prevailing party;" "substantially prevailing party." Once it is established as a matter of legislative intent in one provision that in order to prevail, and thus qualify for counsel fees, a party must obtain some judicial relief on the merits of the litigation, it becomes untenable to argue that Congress meant to attach materially different legal consequences to the

term when it is used in the present rather than the past tense, as a verb as opposed to an adjective, either standing alone or modified by an adverb. That the occurrence of several variations of the term "prevailing" does not by itself evince intent to convey multiple meanings and standards is suggested by Congress itself when, in the Internal Revenue Code, it defined a "prevailing party" as one who "substantially prevails." *See* 26 U.S.C. § 7430(c)(4)(A). Thus, this Court concludes that, absent explicit congressional authority to the contrary, the word "prevailing" cannot be read to embody a legal connotation in one set of attorney's fees statutes and convey its ordinary sense in another.

By the same token, the "catalyst theory" served as the doctrinal underpinning, grounded on essentially the same interpretations of congressional intent and policy reasons, for the courts to award litigants attorney's fees under statutes that contained both the "prevailing party" formulation at issue in *Buckhannon* as well as in cases involving the "substantially prevailing" language of FOIA and other statutes. *See, e.g., Vermont Low Income,* 546 F.2d at 513; *see also Maynard v. CIA,* 986 F.2d 547, 568 (1st Cir.1993); *Reinbold,* 187 F.3d at 363; *Barrett v. Bureau of Customs,* 651 F.2d 1087, 1088 (5th Cir.1981); *DeBold v. Stimson,* 735 F.2d 1037, 1041 (7th Cir. 1984); *Chesapeake Bay Found., Inc. v. U.S., Dept. of Agric.,* 11 F.3d 211, 216 (D.C.Cir.1993). In this Court's reading of *Buckhannon,* there is no basis to hold that a theory which enjoyed nearly universal acceptance by Circuit and District Courts and which the Supreme Court so roundly dispatched and unequivocally discarded as applied in one set of statutes—not only on the basis of legislative history but on policy grounds as well—was left intact in other comparable statutory contexts. This reasoning follows particularly where, as

here, the statutes at issue, broadly viewed, serve similar purposes of encouraging private parties to promote particular public purposes through litigation and their common objective is expressed in "nearly identical" provisions. *Buckhannon,* 532 U.S. at 603 n. 4, 121 S.Ct. 1835.

Indeed, every one of the fundamental flaws the Supreme Court noted in repudiating the catalyst theory in the context of "prevailing party" provisions arises with no less force in connection with the "substantially prevailing" statutes. Under either formulation, a plaintiff theoretically could be awarded counsel fees without obtaining court-sanctioned relief on the merits. A defendant, in a voluntary or unilateral act, could change conduct and surrender in order to avoid further litigation, rather than on the strength of plaintiff's case. A plaintiff could thus "prevail" without altering the legal relationship between the parties. The application for attorney's fees could result in another extensive litigation. And "catalyst hearings" consequently may be necessary, requiring inquiry into the sufficiency of plaintiff's claim, as well as into causation and motivation in defendant's altering of conduct. *See Buckhannon,* 532 U.S. at 605–09, 121 S.Ct. 1835.

The Court next considers UNITE's argument that even if, as *Buckhannon* holds, "prevailing party" is a legal term of art, the term "substantially prevailing" cannot be so regarded. UNITE points out that the latter term does not appear identically defined in the Black's Law Dictionary edition relied upon by the *Buckhannon* Court in construing "prevailing party" and therefore should be defined in accordance with the ordinary meaning of the words. This contention falters on several grounds. First, as discussed above, in concluding that Congress used "prevailing party" as a term of art, the substantive concept's defi-

nition adopted by the Court is associated with the term "prevailing," the same word employed in the FOIA standard of "substantially prevailing." UNITE points to nothing in the legislative history that compels an interpretation that Congress intended the use of the same word in different statutes to carry different meanings. *See Oil, Chem. and Atomic Workers*, 288 F.3d 452, 455–56 (noting that there was nothing to suggest that Congress sought to distinguish between "prevailing party" and "substantially prevail" and that the D.C. Circuit had earlier treated the FOIA "substantially prevail" language as the "functional equivalent" of the "prevailing party" provisions found in other statutes) (citing *Foster*, 561 F.2d at 342); *see also Crabill*, 259 F.3d at 666–67 (equating "prevailing" party in some fee-shifting statutes with "successful" party in others). In *Ruckelshaus*, in fact, the Supreme Court cited the doctrine that use of similar language in different statutes presumes application of the same interpretative standard. *See* 463 U.S. at 692, 103 S.Ct. 3274.

The assumption that the term "prevailing" as used in different statutes carries a similar meaning, raises a question concerning the purpose and effect the term "substantial." UNITE argues that "substantial," as defined in *Black's Law Dictionary* 1597 (4th ed. rev.1968), modifies "prevailing" and means "essentially; without material qualification; in the main; in substance; materially; in a substantial manner." Consequently, UNITE contends, "substantially prevailing" embodies a lower, more encompassing standard than applies to "prevailing party."

The matter is not that simple. First, UNITE's argument is premised on the assumption that the word "prevailing" as found in various fee-shifting provisions must be accorded a meaning other than the restrictive sense the *Buckhannon*

Court explicitly endorsed: being "awarded some relief by the court." *Buckhannon*, 532 U.S. at 603, 121 S.Ct. 1835. Second, in legal contexts, all of the terms defining "substantially" are not entirely synonymous. Even the definition UNITE suggests encompasses a spectrum of shades, nuanced from the broad-banded to the more confined. Narrowly construed, the word "substantially" may mean "in substance" or "in a substantial manner" (as opposed to "in form"), and suggest a more exacting standard than just "essentially." As a qualifier to "prevailing," that usage may be read to demand an inquiry into the degree of success on the merits for which the winner may properly be rewarded.

In fact, it was precisely such a strict construction given to the terms "prevailing party" and "substantially" by courts that prompted Congress' response in establishing the "when appropriate" standard in the Clear Air Act. *See Ruckelshaus*, 463 U.S. at 688 n. 9, 103 S.Ct. 3274 ("Congress meant merely to avoid the necessity for lengthy inquiries into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'") (citing *Best Medium Pub. Co. v. National Insider, Inc.*, 385 F.2d 384 (7th Cir.1967) (affirming a ruling that the prevailing party is the one who prevails as to the substantial part of the litigation); and *Pearson v. Western Elec. Co.*, 542 F.2d 1150 (10th Cir.1976) (holding that only a litigant who has prevailed in court may be entitled to attorney's fees, proportionate to the extent of his recovery)). Consistent with these observations, the D.C. Circuit, concluding that the terms "prevailing party" and "party who prevails" are synonymous, observed that:

> FOIA's addition of the modifier "substantially" might possibly be taken as limiting the category of "prevailing parties," but it cannot be taken as expand-

ing the universe of parties eligible for a fee award. To put this in concrete terms, a FOIA plaintiff may seek thousands of documents but wind up with a judgment providing only a handful of insignificant documents. One might say this plaintiff was a prevailing party, but nevertheless not say that the plaintiff substantially prevailed.

*Oil, Chemical and Atomic Workers*, 288 F.3d 452, 455–56.

■ The shorter answer to UNITE's point, however, is supplied by the *Ruckelshaus* Court's observation that "prevailing" is a relative notion that encompasses different degrees of triumph, as long as it is manifested in some success on the merits. In this context, the term "substantially" would suggest that counsel fees may be awarded not just to parties who fully prevail, but also to those who prevail in part, *see Ruckelshaus*, 463 U.S. at 689–90, 103 S.Ct. 3274, as long as the claimant's victory, whatever its degree, is embodied in a judgment or other judicial-sanctioned relief. *See Buckhannon*, 532 U.S. at 604, 121 S.Ct. 1835. This interpretation is consistent with pre-*Ruckelshaus* cases authorizing award of attorney's fees to litigants who prevailed on some parts of the litigation, but were unsuccessful on other aspects. *See Hensley*, 461 U.S. at 433–35, 103 S.Ct. 1933; *Nadeau*, 581 F.2d at 278 (citing cases).

■ Finally, the Court considers whether legislative history,[10] as well as

policy, support UNITE's argument that Congress intended to distinguish between "substantially prevailing" and "prevailing party," and that the FOIA counsel fees provision should be treated differently from that of other statutes. FOIA was enacted to promote open government and protect the public's right to access public information. The law is grounded on a policy of full disclosure by government agencies, recognizing a presumptive entitlement to disclosure, and shifting to the Government the burden of justifying reasons for not releasing information requested. *See* 5 U.S.C. § 552(b)(1)-(9); *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 385, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980); *Grand Central Partnership v. Cuomo*, 166 F.3d 473, 478 (2d Cir.1999). Congress was mindful of the public purpose in enhancing open government often served by persons who seek disclosure of government documents needed to inform the public, in particular scholars, news media and public interest groups. The task can impose a costly burden, especially when an agency becomes recalcitrant. In recognition of that public purpose and potential cost, Congress added the attorney fee provision to FOIA. *See* S.Rep. No. 93–854, at 17–19 (1974); *Nationwide Bldg. Maint. v. Sampson*, 559 F.2d 704, 711 (D.C.Cir.1977) (noting that FOIA's purpose "to remove the incentive for administrative resistance to disclosure requests based not on the merits of exemption claims, but on the knowledge that many

---

10. The legislation originated with a bill passed by the House of Representatives, H.R. 12471, that authorized assessment of attorney fees against the United States in any case in which the Government "has not prevailed". *Vermont Low Income*, 546 F.2d at 512 (quoting Freedom of Information Act and Amendments of 1974 (94th Cong., 1st Sess., March 1975, at 147)). The Senate version that was later enacted altered the standard to permit fee-shifting when "the complainant has sub-

stantially prevailed" and eliminated specific criteria an earlier draft contained as guidance for the courts' exercise of discretion. Id. at 512–13. In reviewing this legislative history, the Second Circuit, rejecting the government's argument, noted that while the rendering of a final judgment as a condition for an award of attorney's fees would have been required under the original House proposal, it was not the case under the Senate bill as enacted. *Id.* at 513.

FOIA plaintiffs do not have the financial resources or economic incentives to pursue their requests through expensive litigation."); *Kuzma v. I.R.S.*, 821 F.2d 930, 932 (2d Cir.1987).

UNITE maintains that these purposes would be uniquely frustrated if FOIA plaintiffs were required to obtain court-ordered relief on the merits before qualifying for an award of attorney's fees, and that other distinctive features of FOIA litigation support a treatment of FOIA's "substantially prevailing" standard different from the "prevailing party" provision in other fee-shifting statutes. Under this theory, because in FOIA actions private parties necessarily litigate against the Government, the risk of using litigation, even if involving unmeritorious claims, as a means of extorting unwarranted settlements is not an appreciable concern. *Cf. Buckhannon*, 532 U.S. at 617, 121 S.Ct. 1835 (Scalia, J., concurring). In fact, FOIA actions generally entail limited, well-defined relief, and one-time release of particular documents. Damages or other remedies are not at issue. Accordingly, the requirements that plaintiffs demonstrate to the satisfaction of the court that resort to litigation was reasonably necessary, and that the prosecution of the action had a substantial causal effect on the release of the information, serve as safeguards to weed out the frivolous, harassing or mercenary suits.

By the same token, UNITE's reasoning holds, because in FOIA litigation it is solely the government on the other side of the action, thus the purposes of FOIA's fee-shifting provision are peculiarly susceptible to frustration whenever the government chooses, for its own strategic reasons, to surrender withheld information at the last possible moment, thereby rendering the lawsuit moot. *See John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1309, 109 S.Ct. 852, 102 L.Ed.2d 952 (1989).

Further, as successfully argued in FOIA case law applying the catalyst rule, the ability of plaintiffs to recover attorney's fees, even when the prosecution of their claims may have been warranted and represented a substantial cause of the defendant's compliance, would be at the whim or mercy of the government. Without fear of the attorney's fee disincentive, agencies may remain recalcitrant and tender contested documents only on the eve of a disposition of litigation on the merits. Unless it effectively acknowledged the validity of the plaintiff's request, the agency could purposely bar access and prolong litigation, making the prosecution of FOIA actions financially feasible only to plaintiffs able to do so without recovery of fees. By these means, the argument concludes, the effect of FOIA's attorney's fee authority would be largely vitiated. *See Foster v. Boorstin*, 561 F.2d 340, 343 (D.C.Cir.1977) (" 'If the government could avoid liability for fees merely by conceding the cases before final judgment, the impact of the fee provision would be greatly reduced.' ") (quoting *Cuneo v. Rumsfeld*, 553 F.2d 1360, 1365 (D.C.Cir.1977)); *Nationwide Bldg.*, 559 F.2d at 710; *Kaye v. Burns*, 411 F.Supp. 897, 902 (S.D.N.Y.1976). By contrast, in litigation against private defendants for actions entailing more extensive forms of remedies, such as injunctive or declaratory relief and damages, an action is not automatically mooted by a defendant's voluntary decision to concede some wrongdoing or otherwise capitulate.

That the Government in FOIA cases is always the defendant and the dispute confined to the production of public records does not support a conclusion that an attorney's fee claim under FOIA's "substantially prevailing" test must be treated distinctly. In this regard, *Ruckelshaus* is

instructive. There, the Supreme Court noted that the same attorney's fees standard applicable to § 307(f) of the Clear Air Act, which relates to actions brought against the Government, also governed § 304(d), which applies to suits brought against private parties. *See Ruckelshaus* 463 U.S. at 691, 103 S.Ct. 3274 (noting that "similar attorney's fee provisions should be interpreted *pari passu* "); *Hensley*, 461 U.S. at 433 n. 7, 103 S.Ct. 1933 ("The standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.' ").

First, the "substantially prevailing" test appears in other statutes which entail actions for relief sought against private parties both for damages and injunctive or declaratory relief. *See, e.g.,* 42 U.S.C. § 11113 (Health Care Quality Improvement Act) (providing that "a defendant shall not be considered to have substantially prevailed when the plaintiff obtains an award for damages or permanent injunctive or declaratory relief."). UNITE's contention presumably would interpret "substantially prevailing" to mean one thing in FOIA litigation because the Government is the defendant, and something else in suits brought under other statutes containing the same provision in actions against private parties. This argument runs counter to the inter-statute consistency *Ruckelshaus* compels for similar fee-shifting provisions. *See Ruckelshaus,* 463 U.S. at 684 and 691, 103 S.Ct. 3274.

Second, the prospect that the Government, on the eve of defeat on the merits, may moot an action by conceding some or all of the relief for which the litigation was brought, exists as much in actions pursuant to § 307(f) and similar provisions as it does to those under FOIA. "Citizens suits" initiated under § 307(f) permit injunctive and declaratory relief for violations of pub-

lic rights, not for damages for private injuries as permitted under the civil rights laws. *See* · *id.* at 691, 103 S.Ct. 3274. Third, the *Buckhannon* Court, albeit in the context of a "prevailing party" provision considered and rejected as "entirely speculative and unsupported by any empirical evidence," advocates the catalyst theory on the grounds that the doctrine is necessary to prevent defendants from unilaterally mooting an action before judgment and that rejection of the rule would deter plaintiffs with meritorious but expensive cases from undertaking litigation. *Buckhannon,* 532 U.S. at 608, 121 S.Ct. 1835; *see also Regional Sch. Dist. 10,* 278 F.3d at 124 (noting that *Buckhannon* had considered and rejected various policy arguments in favor of the catalyst theory).

Fourth, under some circumstances, the rules governing dispositions based on mootness may operate to minimize the potential for abuse cited by UNITE as grounds for distinguishing claims for attorney's fees under FOIA. The Supreme Court has held that, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). Moreover "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth,* 528 U.S. at 190, 120 S.Ct. 693 (citing *United States v. Concentrated Phosphate Exp. Assn.,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)).

Finally, UNITE insists that, strictly speaking, only "prevailing party" statutes were presented to the Supreme Court in *Buckhannon,* and thus in its holding the Court addressed only those statutes. The

Court made no specific mention of provisions containing "substantially prevailing" language, thus presumably the case should be limited to its holding and not extended to any other circumstances that its implications or dicta may suggest. On this basis, UNITE contends that, in this Circuit, the controlling authority for disposition of the precise issue at hand remains *Vermont Low Income*, which specifically applied to FOIA's "substantially prevailing" provision, and that this precedent was not disturbed by *Buckhannon*. Under this argument, the catalyst theory would remain alive and well here with regard to FOIA's "substantially prevailing" language, even if already buried in connection with other statutes. Confronted with the D.C. Circuit's recent contrary ruling in *Oil, Chem. and Atomic Workers*, UNITE's rebuttal, in an argument recalling Marlowe's retort, responds in essence: but that was in another Circuit, and besides the court is wrong.[11] By extension, UNITE's reasoning suggests that this Court can exercise no choice here but to follow extant Second Circuit doctrine and cannot glance beyond a Circuit Court precedent that has not been explicitly overruled or reversed, even when its foundation has been severely undermined by a recent Supreme Court decision that is, at least arguably, on point. So articulated, this argument raises questions of judicial philosophy.

Admittedly, one of the chastening lessons *Buckhannon* teaches is the risk of improvident reliance on Supreme Court dicta, however justifiable.[12] Nonetheless, with some trepidation, this Court feels compelled to transgress, indeed on the strength and strains of *Buckhannon*'s subtler yet higher tones. It remains hard to miss the larger bell that decision tolls. A lower court called upon to apply Supreme Court precedent cannot just hear the instant gong and ignore its echo, or disregard the repercussions. To be sure, every court, as one of the vows of office, is duty-bound to follow the clear bidding of higher legal authority. But a judge's oath of obedience is not a sworn allegiance to robotics, or an act of unconditional surrender to appellate forums of all discretion to opine on how far the four corners of a given case or law before the court may extend. The art of judging also encompasses a fine prognostic role. When the court is called upon to address ambiguous, conflicting or absent guidance, its function demands reasoned foresight auguring how a superior court might rule. While it must be scrupulously mindful of the case and moment at hand, the court would decide at its peril were it to remain entirely oblivious to the whole breadth of relevant guides and realities it must confront—history, precedent, semantics, the symmetries of logic and reason— that are available as aids to a cogent reading and application of the law.

In this skein of influences, even the well-placed dictum has its place. In particular, the dicta of higher tribunals cannot be lightly dismissed as merely incidental discursion or gratuitous verbiage. Rather, it

**11.** *See* Christopher Marlowe, *The Jew of Malta*, IV, i.

**12.** The Supreme Court acknowledged that the catalyst theory had arisen from the circuit courts' reliance on Supreme Court dicta. *See Buckhannon*, 532 U.S. at 603 n. 5, 121 S.Ct. 1835. In his concurrence, Justice Scalia, recanting his own contribution to the error, confessed that it was "[the Supreme Court's] own misleading dicta" which had sustained the circuit courts' exuberant adherence to the catalyst theory, adding: "[I]nforming the Courts of Appeals that our ill-considered dicta have misled them displays ... not 'disrespect,' but a most becoming (and well-deserved) humility." *Id.* at 621–22, 121 S.Ct. 1835 (emphasis in original).

often serves a useful purpose as a considered means employed by judges to explain and illustrate their reasoning and, by that elaboration, implicitly to suggest. The comments, analogies and synthesis of appellate courts, even when they reach beyond the limited point they decide, may signal helpful guidance, opening small windows through which other courts may peer ahead and catch a deductive glimpse, as in reading the handwriting on the wall, of what potential branchings the law may hold.[13]

To so constrain the range of a court's consideration of what enters into the mix of judicial decision, as UNITE's contention here would have it, would render the growth of the law mechanistic and practically atonal, its outcomes perhaps less pleasing not only to pronounce but to behold. And the rulings such straightjacket judging engenders may prove not just unduly cramped, but also maddening in other ways. In eschewing the course UNITE urges upon this Court, it is especially apt to recall the liberating wisdom expressed in Justice Cardozo's observation that: "Judges march at times to pitiless conclusions under the prod of remorseless logic which is supposed to leave them no alternative." Benjamin N. Cardozo, *The Growth of the Law* 66 (1924).

In this light, in applying a fee-shifting statute in the wake of *Buckhannon*, this Court would have to be virtually tone-deaf not to discern the quite definitive death knells the case sounded for the catalyst theory, casting substantial doubt on the rule's continued vigor beyond the two particular statutes the Supreme Court there construed.

## H. *BUCKHANNON APPLIED*

 Applying the principles of *Buckhannon* to the matter at hand, the Court must deny UNITE's request for attorney's fees. Here, the parties settled between themselves their dispute concerning the documents UNITE had requested and the INS initially withheld. When they reached a full accord they simply notified the Court that their substantive differences had been resolved and that the case could be conditionally discontinued, subject only to agreement as to attorney's fees. Thus, the disposition of the matter involved no judgment or court-ordered consent decree, indeed no other form of judicial relief on the merits that in any way materially altered the legal relationship between the parties. *See Buckhannon*, 532 U.S. at 604, 121 S.Ct. 1835.

At no point prior to the dispute over attorney's fees did the matter require the Court to pass upon whether or not UNITE's complaint was meritorious, colorable or groundless. The Court was not even asked to issue an enforceable order incorporating the terms of an agreement containing the substance of any settlement that acknowledged change in defendant's conduct or retained court jurisdiction for the purposes of enforcement. *See Smyth*, 282 F.3d at 283.

Accordingly, the Court finds no basis for approving UNITE's application. For this reason, the Court does not address INS's

---

**13.** The *Buckhannon* Court observed that the Fourth Circuit, in rejecting the catalyst theory, relied upon language from *Farrar*, although that case, according to the Supreme Court, "involved no catalytic effect." *Buckhannon*, 532 U.S. at 603 n. 5, 121 S.Ct. 1835 (citing *Friends of the Earth*, 528 U.S. at 194, 120 S.Ct. 693; *see also S-1 and S-2*, 21 F.3d at 51). In that instance the Circuit Court, facing ambiguous or conflicting Supreme Court dicta and parting company with every other Circuit, opted for the rule it must have deemed most consistent with its reading of the course logically suggested by the Supreme Court's most recent precedents— the ruling validated by *Buckhannon*.

alternate grounds for objecting to UNITE's counsel fees request.

## ORDER

For the reasons described above, it is hereby

**ORDERED** that UNITE's request for an award of attorney's fees in this matter is DENIED.

**SO ORDERED.**