In the Matter of OCCIDENTAL CHEMICAL CORPORATION et al., Appellants, v NEW YORK STATE ENVIRONMENTAL FACILITIES CORPORATION, Respondent.

Third Department, October 31, 1985

**APPEARANCES OF COUNSEL**

*Whiteman, Osterman & Hanna* (*John Hanna, Jr.,* and *Debra A. Cohn* of counsel), for appellants.

*Robert Abrams, Attorney-General (David A. Munro, Peter H. Schiff* and *James A. Sevinsky* of counsel), for respondent.

## OPINION OF THE COURT

YESAWICH, JR., J.

On April 15, 1983, petitioners applied for industrial revenue bond financing in the amount of $20 million through respondent. With this tax-exempt revenue, petitioners proposed to finance remediation of its Hyde Park landfill in the Town of Niagara, Niagara County.

For nearly two decades, petitioners had buried chemical wastes and residues generated by its nearby chemical manufacturing plant in the landfill. In 1974, the landfill was closed; four years later, in cooperation with interested State and local agencies, petitioners began to monitor and prevent the leach of chemicals to surrounding areas. Dissatisfied with these measures, the Federal Environmental Protection Agency commenced suit against petitioners in December of 1979. Six months later, the State joined in the litigation.

In January 1981, the parties reached a complex settlement which was eventually approved by the Federal District Court for the Western District of New York (*United States v Hooker Chems. & Plastics Corp.,* 540 F Supp 1067). Simply stated, the agreement required petitioners to contain the chemical waste and to monitor and maintain its containment. In addition, petitioners agreed to pay the State $1.5 million to defray the State's anticipated cost of overseeing implementation of the settlement agreement. In return, all Federal and State claims against petitioners were released.

Thereafter, petitioners submitted their loan request to respondent for tax-exempt financing. At respondent's May 1983 board meeting, respondent's chairman observed that petitioners' project "is not unlike those of the General Electric Company and others", for whom respondent had previously approved bond issues, "and encouraged [respondent's] assistance in providing resources to address this type of problem". Respondent proceeded to hold a Federally mandated public hearing (26 USC § 103 [k]) and accepted written public comment; the prevailing view, expressed by private and public figures alike, was in opposition to petitioners' application.

In a resolution dated January 23, 1984, respondent denied petitioners' application "as not being in the public interest", giving the following reasons for this conclusion: first, petition-

ers' remediation of the landfill was the consequence of extensive litigation, and affording it benefits from respondent would result in imposing indirect costs on the State which the court-approved settlement did not contemplate; second, petitioners agreed to the remediation project and possessed adequate financial capacity to effect it without resorting to financing by respondent; third, the testimony at the public hearing and extensive information on the record demonstrate the inappropriateness of granting petitioners' request. When the petition in this CPLR article 78 proceeding challenging respondent's determination was dismissed (125 Misc 2d 1046), this appeal followed.

■ Public Authorities Law § 1285-b delegates discretionary authority to respondent to deny any application "for any reason it deems appropriate in the public interest". Petitioners argue that in disallowing their application as not being in the public interest, without first having prescribed any objective standards or guidelines interpreting the term "public interest", respondent acted arbitrarily and capriciously. Dwelling at length on this argument is unnecessary for it is well established that if the criterion of "public interest" is directly related to and limited by the general purpose of the legislation itself, that is a sufficient guide for agency action (*Matter of International Ry. Co. v Public Serv. Commn.*, 264 App Div 506, 510, *affd* 289 NY 830). The declared policy of the Legislature in authorizing respondent to extend credit to enterprises making the capital outlay to comply with the State's environmental laws is to control and prevent pollution of the air, land and waters of the State and to promote, attract, retain, encourage and develop economically sound commerce and industry (L 1974, ch 1046, § 1). As the purpose of Public Authorities Law § 1285-b is thus quite specific, all that is required of respondent to effect this mandate in any particular instance is conformity with the statutory language and policy (*Village of Herkimer v Axelrod*, 88 AD2d 704, 706, *affd* 58 NY2d 1069; *see, American Power Co. v Securities & Exch. Commn.*, 329 US 90, 106). Contrary to petitioners' assertion, there is no constitutional compulsion on respondent to translate the Legislature's standards into formal and detailed rules of thumb prior to applying them to petitioners' case (*supra*).

■ Petitioners find fault with the reasons articulated by respondent for rejection of their application; they perceive those reasons illusory and deficient. Respondent, quite correctly, considered it significant that petitioners had agreed to

the remediation project as the result of extensive legal proceedings brought earlier by the Government against them in the Federal court. The Environmental Facilities Corporation Act was enacted to create "an attractive incentive for industrial polluters to timely comply with pollution abatement orders of the Commissioner of Environmental Conservation" (Memorandum of Environmental Facilities Corporation, May 6, 1974, Governor's Bill Jacket, L 1974, ch 1046). Given this frame of reference, it was not irrational or unreasonable for respondent to have concluded that public interest is not served by awarding financing benefits to those who must be induced by government litigation to undertake timely remediation projects. As the Ecumenical Task Force of the Niagara Frontier aptly observed in its comments submitted at the public hearing on petitioners' application, the latter needed no inducement to clean up the Hyde Park landfill since it was already obliged by court order to do so and "the proposed tax free bonds would not accelerate the cleanup project. Thus no public benefit would result from these publicly subsidized bonds."

As for petitioners' assertion that respondent's dependence upon the fact that extensive litigation was necessary to achieve environmental law compliance contravenes the express terms of the Federal settlement which specifically stated "the parties hereto may not rely upon this judgment in any other action or proceeding", we note that, unlike the State agency in *Matter of Farmland Dairies v Barber* (65 NY2d 51, 58), respondent placed absolutely no reliance on the prior judgment. What it did attribute significance to was that the catalyst ultimately stimulating acceptable remedial activity was the prolonged litigation which preceded the settlement agreement; this is consistent with respondent's mandate to encourage voluntary compliance and does not betray any condition of the settlement.

Another factor underlying respondent's decision was petitioners' financial capacity to fulfill its obligation of remedying the Hyde Park site without State bonding assistance. Petitioners maintain that this is incongruous in that the statute requires applicants to "secure the necessary financing" (Public Authorities Law § 1285-b); hence, respondent can only approve those who are credit worthy. However, respondent was designed in part to extend financial aid to industries that cannot make the required capital expenditure without jeopardizing their continued operation in this State (L 1974, ch 1046, § 1).

By entering into the settlement agreement, petitioners implicitly indicated that they possessed the funds needed to perform the cleanup without recourse to financing by respondent and that, while underwriting this cost, it could still continue to function in the State.

Parenthetically, we find unpersuasive the suggestion that respondent's approval of financing for General Electric ordains approval of petitioners' application. Although the record is sparse as to the attendant conditions when General Electric's application was entertained, it appears that the cases are dissimilar. Not only did General Electric agree to remediate its landfill sites without litigation, but many public officials, environmental groups and local residents urged upon respondent that granting petitioners' application would be contrary to sound public policy (cf. *Matter of Italian Sons & Daughters v Common Council*, 89 AD2d 822, 823).

KANE, J. P., MAIN, WEISS and HARVEY, JJ., concur.

Judgment affirmed, with costs.