**BATH PETROLEUM STORAGE, INC.,
and E.I.L. Petroleum Plaintiffs,**

v.

**Gregory H. SOVAS, individually as Director of the Division of Mineral Resources, New York State Department of Environmental Conservation; Bradley J. Field, individually and as Acting Director of the Bureau of Oil and Gas Regulation, Division of Mineral Resources, New York State Department of Environmental Conservation; Thomas W. Pearson, individually and as Regional Water Engineer, Region 8, Division of Water, New York State Department of Environmental Conservation; John Cahill, individually and as Commissioner of the New York State Department of Environmental Conservation; New York State Department of Environmental Conservation; and the State of New York, Defendants.**

No. 98–CV–347.

United States District Court,
N.D. New York.

March 19, 2004.

---

Jerry William Boykin, W. Michael Holm, Womble, Carlyle Law Firm, Vienna, VA, John J. Privitera, McNamee, Lochner Law Firm, Albany, NY, for Plaintiffs.

Joseph S. Koczaja, Kathleen L. Morrison, Albany, NY, for Defendants.

### MEMORANDUM–DECISION AND ORDER

KAHN, District Judge.

Presently before the Court are a motion to reconsider and two opposing summary judgment motions. The motion to reconsider is premised upon a discovery ruling that denied Plaintiffs, Bath Petroleum Storage, Inc., and its parent company E.I.L. Petroleum, Inc. (collectively "Plaintiffs" or "Bath") access to documents of Defendants, New York's Department of Environmental Conservation ("DEC"). At issue in the summary judgment motions is whether DEC is preempted by several federal statutes from regulating the Bath facility.

## MOTION FOR RECONSIDERATION

The first motion before the Court is Plaintiffs' motion for reconsideration in part of the Magistrate Judge's Order of April 25, 2002. (Dkt. No. 92). Specifically, Plaintiffs seek reconsideration of their request that 10 documents at issue in that Order be released. For the reasons provided below, Plaintiffs' request for reconsideration is denied.

## I. Motion for Reconsideration Standard

■■■■ There are three possible grounds upon which a motion for reconsideration may be granted: (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice. *In re C–TC 9th Ave. Partnership*, 182 B.R. 1, 3 (N.D.N.Y.1995). A district judge may reconsider any pretrial matter determined by a magistrate judge under a "clearly erroneous or contrary to law" standard of review. *See* 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a). A party seeking to overturn a ruling under the clearly erroneous standard generally bears a "heavy burden." *See Com–Tech Assoc., v. Computer Assoc., Int'l, Inc.*, 753 F.Supp. 1078, 1099 (E.D.N.Y.1990), *aff'd*, 938 F.2d 1574 (2d Cir.1991). The Supreme Court has stated that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *U.S. v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948) (quoted in *Derthick v. Bassett–Walker Inc.*, Nos. 90 Civ. 5427, 1992 WL 249951 at

* 8 (S.D.N.Y. Sept. 23, 1992)). Pursuant to this highly deferential standard of review, magistrate judges are afforded broad discretion and reversal is only appropriate if there is an abuse of discretion. *See Derthick v. Bassett–Walker Inc.*, 1992 WL 249951 at * 8 (S.D.N.Y. Sept. 23, 1992). *See, e.g., Nikkal Industries, Ltd. v. Salton, Inc.*, 689 F.Supp. 187, 189 (S.D.N.Y.1988) (magistrate judge's decision on discovery dispute should be afforded substantial deference and overturned only if found to be an abuse of discretion).

As Bath makes no claim that there has been an intervening change in the controlling law, nor that there is new evidence that was not previously available, the Court reads its' motion as claiming that the Magistrate Judge's decision involved a clear error. Therefore, the motion for reconsideration will be granted only upon a finding that the Magistrate Judge abused his discretion.

## II. Magistrate Judge's Ruling

In the instant case, the Magistrate's Judge's order of April 25, 2002 was issued in response to an on-going dispute concerning the discovery of 98 documents. Therein, Judge Treece ordered the release of 20 of the disputed documents. Judge Treece further ordered that the remaining documents were privileged and granted Defendant a protective order, precluding Plaintiffs' discovery of them. Bath now seeks reconsideration of this order with respect to 10 documents held to be privileged by Judge Treece.[1]

### (a) Deliberative Process Privilege

■■■■ The deliberative process privilege "rests on the obvious assertion that

---

1. The documents at issue are Bates Nos.: 806269–806270; 800101–800103; 833773–833774; 833590; 806843–806845; 1000621–1000625; 1005616; 800121–800123; 805445–805446; 805649. However, an *in* camera review makes it clear that of these 10 documents, two of them, namely 800101–800103 and 800121–800123, are duplicates.

officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) (internal citations and quotations omitted). To qualify for this privilege, the documents must be (1) predecisional, and (2) deliberative. *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d. Cir.1999). "A document is predecisional when it is prepared in order to assist an agency decisionmaker in arriving at his decision.... The privilege protects recommendations, draft documents, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* (internal citations and quotations omitted). "A document is deliberative when it is actually related to the process by which policies are formulated." *Id.* Furthermore, the privilege does not generally extend to material which is purely factual, and factual material once severed from the privileged material in a document is discoverable. *Id.* (collecting cases).

### (b) The Field affidavit

█ In assessing DEC's claims of privilege to the documents at issue, Judge Treece relied on the April 5, 2002 affidavit of Bradley J. Field, Director of Mineral Resources of DEC.[2] Mr. Field's affidavit

was filed and continues to be under seal. Plaintiffs acknowledge that the affidavit's contents have not been revealed to them. (Dkt. No. 93 at 2). Because they have not reviewed the document that provide the basis for Judge Treece's decision, Plaintiffs recognize that they "cannot substantively challenge Field's assertions in support of the claim of privileges as to these particular documents at issue." (Dkt. No. 93 at 2). Rather, Plaintiffs go on to say that "they are confined to putting forth, as best they can, reasons why the documents would appear, from the descriptions made, to fall outside of the asserted privileges." (Dkt. No. 93 at 2). While Bath puts forth specific arguments for each document, Bath has not seen the documents nor Mr. Field's detailed affidavit and its arguments amount to conjecture. Such conjecture on the part of Plaintiffs can hardly be sufficient to carry the "heavy burden" placed on them to demonstrate that the Magistrate Judge abused his discretion. Plaintiffs recognize that they "cannot knowledgeably evaluate whether [Mr. Field's affidavit's] contents comply with the legal requirements necessary to sustain the privileges asserted" and they "ask this Court to make that independent analysis." (Dkt. No. 93 at 3). Such requests indicate that rather than meeting their burden, Plaintiffs have redistributed it to the Court.

Mr. Field's April 5, 2002 affidavit satisfies the requirement that the affidavit specifically designate and describe the information that is purportedly privileged for eight of the ten disputed documents.[3] *Mo-*

Plaintiffs acknowledge this fact. (Dkt. No. 93 at 14).

**2.** The affidavit dated April 5, 2002 was filed to supplement Mr. Field's first affidavit of January 28, 2002 (Dkt. No. 75). This supplemental affidavit was required because the first affidavit included "generalizations [that] did not meet the standard necessary for this re-

view." Maj. Judge Treece's Decision and Order at 2 (April 25, 2002). (Dkt. No. 89).

**3.** Specifically, those documents are: Bates Nos. 80629–806270, 833773–833774, 833590, 806843–806845, 1000621–1000625, 1005616, 805445–805446, 805649. Although the Court holds that the Magistrate Judge did not abuse his discretion with respect to Document

bil Oil v. Dep't. of Energy, 520 F.Supp. 414, 416 (N.D.N.Y.1981). Mr. Field's affidavit provides for each of these documents: (1) a description, (2) the type of deliberation(s), and (3) the agency position or decision to which it led. The descriptions of the documents in Mr. Field's April 5, 2002 affidavit are often extensive and leave little mystery as to the contents of the disputed material. Those descriptions that are brief describe documents which themselves are short, or otherwise, additional information describing the documents appear in the column specifying the type of deliberation.

### 1. Documents must be deliberative

■ The government bears the burden of proving that the document is "deliberative". *Mary Imogene Bassett Hosp. v. Sullivan,* 136 F.R.D. 42, 44 (N.D.N.Y. 1991). Mr. Field's affidavit satisfies this requirement by explaining for each document the "type of deliberation(s)". Mr. Field provides an extensive explanation of such matters, noting whether the document contains the writer's own analysis, viewpoint, or recommendations. The deliberative process privilege is intended to protect documents with such personal opinions from dissemination. The sworn explanations of Mr. Field, in addition to a review of the documents, provide sufficient evidence that the Magistrate did not abuse his discretion in finding that the documents at issue were deliberative.

### 2. Documents must be pre-decisional

■ The government also bears the burden of proving the documents were pre-decisional. *Mary Imogene Bassett Hosp.,* 136 F.R.D. at 44. The Magistrate did not abuse his discretion in holding that this requirement was satisfied as to

1000621–1000625, this analysis is inconsequential because Plaintiffs are in possession of this document as evidenced by their use of

the contested documents. The DEC's policy positions, or decision, that the documents fueled are explained by Mr. Field in his affidavit. It is clear from such descriptions that the documents were created prior to the DEC's final decision on the matters contained in each. Hence, the Magistrate Judge did not abuse his discretion in finding that these documents were pre-decisional, and the documents therefore satisfied the requirements for the deliberative process privilege.

### 3. No need for discovery outweighs the privilege

Plaintiff makes no convincing argument that the need for discovery of these documents outweighs the privilege. *See, e.g., Mary Imogene Bassett Hosp.,* 136 F.R.D. at 44 (instructing that the deliberative process privilege is a qualified one, and the court must conduct a balancing test, considering (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the seriousness of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are voidable). While Plaintiffs argue that an *in camera* inspection of the documents cannot substitute for a comprehensive affidavit, (Dkt. No. 93 at 4), in the present case, the inspection of the documents, coupled with the Field affidavit that Plaintiffs have not seen, supply the Court with sufficient knowledge of the documents' contents. *See Grand Cent. P'ship,* 166 F.3d at 483. The Magistrate did not abuse his discretion and there was no clear error in finding that privilege attaches these eight documents.

it as a deposition exhibit on May 28, 2002. (Dkt. No. 95 at 2).

*4. Privilege question is moot with respect to the remaining document*

The Court now takes up consideration of the remaining document, namely Document Bates No. 800101–800103.[4] As ordered by a subpoena served upon the Governor's Office of Regulatory Reform on December 31, 2001, Plaintiffs obtained an un-redacted copy of the 800101–800103 document. (Dkt. No. 95 at 7). As this document is in Plaintiffs' possession, the question of discovery is moot. The Court declines to decide whether the Magistrate Judge abused his discretion in holding that the deliberative process privilege was properly invoked as to this document.

### SUMMARY JUDGMENT MOTIONS

Plaintiffs argue that New York is preempted from regulating its facility by Congress' grant of authority to the Environmental Protection Agency ("EPA") in the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f (2001), *et seq.* Specifically, Bath asks the Court to hold that the state is preempted based on two permits that were issued to Bath by the EPA under the SDWA's Underground Injection Control ("UIC") program, 42 U.S.C. §§ 300h to 300h–8. Bath further argues that the DEC is preempted because of the assertion of jurisdiction by the Federal Energy Regulatory Commission ("FERC") under the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717, *et seq.*, and Natural Gas Pipeline Safety Act ("NGPSA"), 49 U.S.C. §§ 60101, *et seq.*

Bath further seeks to preclude DEC action by claiming that the agency has failed to enact regulations that would allow it to require sonar surveys. Finally, Bath objects to the enforcement action that DEC is pursuing against it.

### I. Background

#### (a) The Bath facility

Bath operates a facility in Steuben County, New York that stores liquified petroleum gas ("LPG") in salt storage caverns which lie approximately 1/2 mile below the surface of the earth. (Dkt. No. 116, ¶ 7).

Bath created these caverns by "solution-mining." In this process, a well is first drilled from the surface of the earth until it reaches the permeable salt layer. Fresh water is then pumped into the salt layer. The water becomes saturated with salt, and the resulting mixture, brine, is contained in the newly created cavern. When Bath receives LPG product, it transfers brine from the underground caverns into holding ponds on the surface to create storage space in the caverns. In response to delivery requests, Bath pumps brine from the holding ponds into the caverns to displace LPG that is stored there.

On March 8, 1996, Bath filed an application with the EPA for a Class IID UIC Permit ("Class IID permit"). On May 21, 1996 Bath filed for a Class III UIC Permit ("Class III permit"). (Dkt. No. 112, ¶ 15). Around August 1998, the EPA issued both permits.[5] The scope of these permits is a source of contention between the parties.

#### (b) Class IID UIC Permit

Bath and DEC agree that the Class IID permit allows Bath to dispose of solution mined brine through a Class IID under-

---

4. As previously noted, this document is a duplicate of the document with Bates Nos. 800121–800123. Therefore, this discussion constitutes the Court's holding as to both documents 800101–800103 and 800121–800123.

5. Bath states that the permits were issued on August 25, 1998. (Dkt. No. 112, ¶ 18). DEC states that on August 25, 1998 the EPA issued a "Notice of Issuance of Final Underground Injection Permits." (Dkt. No. 116, ¶ 18). The permits became effective 30 days later. (Dkt. No. 116, ¶ 18).

ground injection well, Bath's Well No. 8. Bath argues that this permit gives it the authority to operate that well as a brine disposal well, and the DEC is preempted from further regulating Well No. 8 in any way that interferes with the rights granted in that permit. DEC contends that to operate the well, a State Pollutant Discharge Elimination System ("SPDES") permit, pursuant to New York's Environmental Conservation Law ("ECL") Article 17, is also required. DEC argues that in contrast to the UIC permit which seeks to protect underground drinking water sources, this state permit seeks to protect *all* state groundwaters from the discharge of pollutants such as brine.

### (c) Class III UIC Permit

Second, a Class III permit has been issued by the EPA. DEC and Bath agree that this permit allows Bath to expand the caverns to a diameter of 200 feet and use fresh water to solution the caverns. However, DEC argues that under ECL 23–1301, it has the authority to require Bath to obtain a permit for the subsequent underground storage of hydrocarbons, such as LPG, in the modified caverns. As part of the application for this state issued Article 23 permit, DEC has required sonar surveys. Bath argues that DEC cannot impose sonar survey requirements because it is preempted by EPA's decision during the Class III application process that sonar surveys were not required. Upon Bath's failure to submit sonar surveys, DEC denied the ECL Article 23 permit.

This litigation does not mark the introduction of the parties. Rather, they have been in several complex litigations concerning environmental regulation of the facility. The pertinent facts will be set forth in the discussion that follows.

## II. Discussion

### (a) Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In applying this standard, courts must " 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.' " *Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir.2001) (quoting *Cifra v. Gen. Elec., Co.,* 252 F.3d 205, 216 (2d Cir.2001)).

Once the moving party meets its initial burden by demonstrating that no material fact exists for trial, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The nonmovant "must come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown,* 257 F.3d at 251 (citation omitted). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *W. World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990).

### (b) Preemption

Preemption is a concept embedded in the United States Constitution. The Supremacy Clause declares that "the Laws of the United States... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in

the Constitution, or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

■■■ Under this clause, federal law may supersede state laws or actions in three ways. In what has been called "express preemption", Congress may state in express terms that its law preempts state law. *Hillsborough County, Florida v. Automated Med. Labs.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). The second kind of preemption has been termed "field preemption". Field preemption "may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation." *Cal. Fed. Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 280–81, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) (internal citations omitted). Third, state law is preempted to the extent that it actually conflicts with federal law. Even "where Congress has not completely displaced state regulation in an area, state regulation may nonetheless be pre-empted to the extent that it actually conflicts with federal law—that is, to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 477, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

The parties do not contest that Congress did not expressly pre-empt state law in enacting the SDWA. Therefore, the Court will only address whether (1) Congress has pre-empted the field of underground injection control regulation, or (2) there is an actual conflict between the DEC actions and the legislation or promulgated regulations pursuant to the SDWA.

### 1. Field pre-emption

■■■ The SDWA was enacted "to assure that water supply systems serving the public meet minimum national standards for protection of public health." *City of Evansville, Inc. v. Ky. Liquid Recycling*, 604 F.2d 1008, 1016 n. 25 (7th Cir.1979) (quoting H.R.Rep. No. 93–1185, reprinted in [1974] U.S.Code Cong. & Admin. News at 6454), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980). The SDWA evinces Congress' intent to occupy the field of public drinking water regulation. *Mattoon v. City of Pittsfield*, 980 F.2d 1, 4 (1st Cir.1992). *See also Arco Oil and Gas Co. v. E.P.A.*, 14 F.3d 1431, 1436 (10th Cir.1993). Therefore, in the field of public drinking water regulation, state regulation is pre-empted by the federal statute.

### (i) The UIC program preempts the field

The federal underground injection control ("UIC") program was established in part C of the SDWA and was similarly enacted to protect underground drinking water sources endangered by underground injection. *LEAF v. EPA*, 118 F.3d 1467, 1475–76 (11th Cir.1997) (quoting the House Report, H.R.Rep. No. 93–1185 at 29, reprinted in 1974 U.S.C.C.A.N. 6454, 6481); 42 U.S.C. § 300h–1(a); 42 U.S.C. § 300h–(b)(1). As the SDWA preempts the field, the UIC program, a program authorized under the SDWA, similarly preempts the field it occupies.

Under the SDWA's UIC program and corresponding regulations, a state may seek "primacy", that is, obtain EPA approval for a UIC program and then oversee the program in that state. 42 U.S.C. § 300h–1. Failure to seek such primacy prohibits the state from regulating the UIC program, and instead leaves it under the auspices of the EPA. 42 U.S.C. § 300h–1. Because New York has not

sought primacy of the UIC program, the state cannot regulate the UIC program, and the EPA administers it in New York.

### (ii) State regulation is permitted outside of the preempted field

■ However, even though the field has been preempted, there is room for state regulation over areas in which the SDWA and its UIC program don't enter. DEC recognizes that by not seeking primacy, it has no authority to regulate the UIC program, but it argues that "the UIC program leaves ample room for DEC to regulate matters." (Dkt. No. 118 at 14). At least one circuit has recognized that when field preemption is established, if a federal agency nonetheless instructs an applicant to obtain the relevant state permits, this demonstrates that "even within an occupied field federal regulations may tolerate or authorize some exercise of state authority." *NE Hub Partners v. CNG Transmission Corp.*, 239 F.3d 333, 346 n. 13 (3d Cir.2001).

The EPA has repeatedly instructed that DEC regulates hydrocarbon storage (Dkt. No. 112, Exhibit 6: EPA Class III Permit Responsiveness Summary at 832384) and the surface discharge of brine (Dkt. No. 119, Exhibit 4: EPA Class IID Permit Responsiveness Summary) and that Bath is not excused from obtaining relevant state approval. *See* Dkt. No. 112, Exhibit 4: Class IID permit at 3–4, Exhibit 5: Class III Permit at 3–4, Exhibit 6: EPA Class III Permit Responsiveness Summary at 832385. Such warnings indicate that within the occupied field, the federal government authorizes the limited exercise of state regulation. Thus, the EPA regulates underground injection for the protection of underground drinking water, but the state still retains limited regulatory authority over underground injection.

Both parties to this action discuss 42 U.S.C. § 300h–2(d), the "savings clause", that appears in the UIC program's statute:

**(d) State authority to adopt or enforce laws or regulations respecting underground injection unaffected**

Nothing in this subchapter shall diminish any authority of a State or political subdivision to adopt or enforce any law or regulation respecting underground injection but no such law or regulation shall relieve any person of any requirement otherwise applicable under this subchapter.

Plaintiffs interpret this "savings clause" to mean that a state retains authority to fully act in the field of underground injection control only if that state has submitted and received EPA approval for a UIC program. (Dkt. No. 113 at 27). However, if that interpretation were correct, then this clause would be redundant. 42 U.S.C. § 300h–1 clearly establishes that a state can independently administer a UIC program only if it obtains EPA approval. In light of this policy being established in another section of the regulation, it is necessary to assign this savings clause a different meaning. *Union of Needletrades v. U.S. I.N.S.*, 202 F.Supp.2d 265, 271 (S.D.N.Y.2002) ("Courts ... are obliged to give effect to every clause and word of a statute and to avoid reading legislation in a way that renders some words altogether redundant.") (internal citations omitted). *See also U.S. v. Nordic Vill.*, 503 U.S. 30, 35–36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (explaining that every word must be given operative effect otherwise one paragraph in the statute would have no function).

The Court interprets this savings clause to reinforce that Congress intended that states retain authority respecting underground injection so long as it does not impinge on the UIC program administered

by the EPA. *See Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 492, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) (Clean Water Act's savings clause made it clear "[a]lthough Congress intended to dominate the field of pollution regulation, the savings clause negates the inference that Congress 'left no room' for state causes of action.").

### (iii) Sonar surveys and field preemption

By requiring sonar surveys for the state storage permit, DEC is not acting within the field regulated by the federal UIC program.

The parties agree that the Class III permit allows Bath to expand its caverns. Because DEC's request to require sonar surveys of the caverns was considered in the Class III permit application process, Bath argues that DEC is preempted from requiring sonar surveys. (Dkt. No. 113 at 23). DEC asserts that sonar surveys have been requested pursuant to ECL 23–1301, as part of the state's regulation for caverns that store LPG. (Dkt. No. 116, ¶¶ 19, 22; Dkt. No. 118, at 11).

The EPA Class III permit allows Bath to operate a well that injects for the extraction of minerals such as salt to expand caverns and, to inject fluids to displace gas stored in the caverns. *See* 40 C.F.R. 144.6(c). The permit does not permit Bath to also store LPG in those modified caverns. The EPA specifically stated that this permit "is for the injection of water into a salt bed, not for the storage of LPG or gas." (Dkt. No. 112, Exhibit 6: EPA Class III Permit Responsiveness Summary at 832385).

DEC has the authority to regulate hydrocarbon storage, as recognized by the EPA. *See* Dkt. No. 112, Exhibit 6: EPA Class III Permit Responsiveness Summary at 832384 ("Storage of hydrocarbons in caverns is also regulated by the Mineral Resources Division of the New York State

[DEC]."). In its regulation of underground storage pursuant to ECL 23–1301, DEC may require a permit to store LPG in a modified cavern. *In re Bath Petroleum Storage, Inc. v. DEC,* 244 A.D.2d 624, 663 N.Y.S.2d 719 (3rd Dept.1997). Even Bath acknowledged DEC's regulatory authority when it stated that the "issue before this Court is not *whether* the DEC has statutory authority to regulate the underground storage of [LPG] and other hydrocarbons in New York. The issue is whether in exercising that authority, it may do so in a way that undermines the federally administered program." (Dkt. No. 124, at 3) (emphasis added). Such statements demonstrate acquiescence that DEC has authority to regulate LPG and is not preempted in that field.

### (iv) Field preemption and the SPDES Permit

Additionally, DEC is not acting within the field regulated by the federal UIC program by requiring an SPDES permit.

DEC asserts that it retains the authority to require that Bath obtain an SPDES permit to discharge brine wastewater to the groundwaters of the state. (Dkt. No. 118, at 9). Bath contests this requirement because it argues that (1) the SDWA preempts this regulation, and (2) the permit is not necessary because its expert notes that no significant groundwater was ever encountered when drilling Well No. 8. (Dkt. No. 113, at 24).

The SPDES permitting program is codified in ECL Article 17, Title 8, *State Pollutant Discharge Ellimination System.* Relevant to the Court's analysis is the New York Legislature's stated purpose in enacting this program:

**§ 17–0801 Purpose**

To create a state pollutant discharge elimination system (SPDES) to insure that the State of New York shall possess

adequate authority to issue permits regulating the discharge of pollutants... into the waters of the state, upon condition that such discharges will conform to and meet all applicable requirements of the Federal Water Pollution Control Act... and rules, regulations, guidelines, criteria, standards and limitations adopted pursuant thereto relating to effluent limitations, water quality related effluent limitations, new source performance standards, toxic and pretreatment effluent limitations, ocean discharge criteria, and monitoring to participate in the nation pollutant discharge elimination system (NPDES) created by the [Federal Water Pollution Control] Act.

Since 1973 when this state provision was enacted, the "Federal Water Pollution Control Act" has been renamed the "Clean Water Act" ("CWA"). The CWA established the NPDES permitting system, but allows states to administer the program once obtaining EPA approval. New York has obtained such approval, and the legislation cited above codifies the approval in the SPDES program.

The SPDES permitting program carries out the directives of the Clean Water Act. The DEC and its SPDES permit program are preempted by the SDWA then only if the CWA is preempted by the SDWA. Bath argues that the SPDES program is preempted because the "perceived basis of this [SPDES program] is to protect New York State's groundwater resources—the very goal of the EPA-administered UIC program." (Dkt. No. 122 at 11). Courts have held that the SDWA does not preempt the CWA:

Clearly, the Safe Drinking Water Act does not provide adequate justification for ignoring the express and unambiguous directive of the previously adopted Clean Water Act. The objective of the Clean Water Act is to preserve the environmental integrity of navigable waters, while the objective of the Safe Drinking Water Act is to prescribe minimum national standards concerning the purity of drinking water for the protection of the public health. Neither of these objectives are mutually exclusive.

*Hudson River Fishermen's Ass'n v. City of New York,* 751 F.Supp. 1088, 1100 (S.D.N.Y.1990)

In *Hudson River Fishermen's Association,* the Southern District held that DEC had no authority to exempt New York City from CWA requirements merely because the City was attempting to obtain the relevant permit in compliance with the SDWA. Specifically, the City argued that "DEC, exercising its scientific expertise, has decided to address *all* of the environmental issues posed by the Chelsea Pumping Station within the context of granting or denying [a SDWA] water supply permit". *Id.* at 1099. In rejecting this argument, the court recognized that "where 'two statutes are capable of coexistence, it is the duty of the court, absent a clearly expressed congressional intent to the contrary, to regard each as effective.'" *Id.* at 1100 (quoting *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)). *See also Natural Resources Defense Council, Inc., et al v. U.S.E.P.A.,* 824 F.2d 1258 (1st Cir.1987) (holding that EPA's regulation under the Nuclear Waste Policy Act was arbitrary and capricious where the standards therein authorized underground injection that violated the SDWA).

A Class IID UIC permit does not excuse compliance with other applicable state regulations. The EPA recognizes this:

The federally issued UIC permits in question will regulate fluid injection wells.... Surface disposal of fluids, such as into waterways, will not be regulated

by these permits. At the federal level, discharges into surface waterways are regulated pursuant to the Clean Water Act. That program was delegated to New York State. Therefore, surface discharges would come under the jurisdiction of NYSDEC and surface discharges would be regulated under [SPDES].

Dkt. No. 119, Exhibit 4: EPA Class IID Permit Responsiveness Summary.

The SPDES permit program is not preempted by the SDWA, and DEC may order Bath to obtain this permit.

Bath also argues that its expert demonstrated that an SPDES permit is unnecessary based on the SPDES permit requirements and standards. The Court will not answer the question of whether a state permit is actually needed to comply with state regulation at the Bath facility.

### 2. Conflict Preemption

The next step is to determine whether there is a conflict between EPA and DEC actions such that DEC is preempted under the rationale of conflict preemption. "Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it *actually conflicts* with federal law." *Hillsborough County, Florida v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Such a conflict necessarily arises where " 'compliance with both federal and state regulations is a physical impossibility.' " *Id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)). Moreover, an actual conflict exists when a state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' " in enacting federal legislation. *Id.* (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

In areas where federal and state law are meant to be implemented together, then that state law does not frustrate the effectiveness of federal law. Enforcement of one cannot be said to impede the other. In "an area of collaborative federal and state regulation, coincidence of purpose actually militates against, rather than in favor of, preemption. Where the Government has provided for collaboration the courts should not find conflict." *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 497 (9th Cir., 1984) (citations omitted) (finding no preemption because the federal statute "which deals with a limited category of vessels and pollutants, is of course only a small part of the overall federal marine environmental protection scheme.").

### (i) Conflict preemption and the sonar surveys

Before issuing the Class III UIC permit, the EPA held a public comment period to solicit public feedback. DEC filed written comments that the EPA should require sonar surveys. After considering the DEC's comments, the EPA did not immediately require sonar surveys, but said that it may eventually require such surveys. *See* Dkt. No. 112, Exhibit 6: EPA Class III Permit Responsiveness Summary at 832370.

Bath argues that "[g]iven that the EPA included its right to require the sonar surveys in the future as a condition of the UIC permit, the DEC is precluded from insisting upon these tests to satisfy its own desires." (Dkt. No. 113 at 23). However, DEC argues that conflict preemption does not preclude its exercise of authority over the Bath facility because the "UIC program does not set standards for... the storage of hydrocarbons," and it is the storage of hydrocarbons that DEC is at-

tempting to regulate with the sonar survey requirement. (Dkt. No. 118 at 22).

■ The first consideration is whether there is a direct conflict that makes adherence to both permits physically impossible. Although it acknowledged that it *may* ask for sonar surveys in the future, EPA itself instructed that "any sonar-survey requirement would be *separate* from the monitoring plan called for [in the Class III permit]." (Dkt. No. 112, Exhibit 6: EPA Class III Permit Responsiveness Summary at 832370) (emphasis added). Therefore, because sonar surveys are not a part of the UIC Class III permit, performing sonar surveys does not violate any terms of that permit. It is possible for Bath to adhere to the EPA UIC Class III permit terms, while at the same time conducting DEC's required sonar surveys to comply with state permitting requirements. DEC's sonar survey requirement does not create a direct conflict with federal law.

Second, the Court must consider whether conducting sonar surveys stands as an obstacle to the objectives of federal law. In a recent Second Circuit decision, *Clean Air Markets Group v. Pataki*, 338 F.3d 82, 84 (2d Cir.2003), a Clean Air Act provision limited SO$_2$ emissions, but allowed efficient corporations to sell emissions allowances to *any* other utility. A New York regulation assessed a fee to in-state corporations that sold their allowances to utilities in certain geographical locations, because the pollution from those purchasers made its way into New York. *Id.* A conflict existed because the state regulation effectively prevented the transfer of allowances to "anyone" as the federal regulation encouraged. *Id.* at 88. Additionally, Congress had considered and rejected the idea of imposing geographical limitations on emissions allowance transfers which the state now imposed. *Id.* Finally, "EPA regulations expressly mandate that state programs... shall not restrict or interfere

with allowance trading." *Id.* The court struck down the state law finding that it actually negated Congress' objective of creating a *nationwide* trading system of SO$_2$ emissions allowances.

In the case at bar, however, the Article 23 permit requirements do not impede the federal objective of nationally protecting underground sources of drinking water, nor do they interfere with the methods by which that goal is obtained. Unlike in *Clean Air Markets*, where the EPA regulation instructed that state regulation may not interfere with allowance trading, the EPA has instructed Bath that state hydrocarbon storage regulations are intended to work in unison to regulate an underground injection facility that stores LPG.

In addressing DEC's request that Bath conduct sonar surveys prior to issuance of the UIC permits, the EPA responded by assessing whether sonar surveys were necessary to "ensure that no fluid can leave the injection zone and migrate up toward underground sources of drinking water...." Dkt. No. 112, Exhibit 6: EPA Class III Permit Responsiveness Summary at 832370. EPA considered whether sonar surveys were necessary to protect underground sources of drinking water in accordance with the SDWA purpose.

However, EPA defers to DEC to regulate hydrocarbon storage. The EPA specifically recognizes DEC's authority in this area, and instructs permit applicants to adhere to state regulatory requirements. *See* Dkt. No. 112, Exhibit 6: EPA Class III Permit Responsiveness Summary at 832384, 832385. The DEC requirement that sonar surveys be conducted does not impact the method or objective of protecting underground drinking water sources.

The sonar survey requirement stemming from the Article 23 permitting process is not an obstacle to, nor does it impede, the full effectiveness of the federal goal of

protecting underground drinking water sources. EPA recognizes DEC's independent authority to regulate LPG storage.

### (ii) Conflict preemption and the SPDES Permit

Bath argues that the state is preempted from requiring an SPDES permit because it stands as an obstacle to Bath's use of its EPA permit. Bath argues that the state requirements are an obstacle because the "direct effect of [the] State action is to render useless Bath's federal Class IID UIC permit for Well No. 8." (Dkt. No. 122, at 24).

In the present case, the state statute that requires Bath to obtain a SPDES permit does not frustrate the full effectiveness of federal law. As explained above, the state SPDES permit program is authorized by the CWA. The CWA and SDWA are in fact complementary and must be implemented together. *Hudson River Fishermen's Ass'n*, 751 F.Supp. at 1100 (Explaining that the objectives of the SDWA and the CWA are not in conflict, but rather are complementary, and because the two statutes are capable of coexistence, it is the duty of the court to regard each as effective). As noted above, the EPA even stated:

> The federally issued UIC permits in question will regulate fluid injection wells.... At the federal level, discharges into surface waterways are regulated pursuant to the Clean Water Act. That program was delegated to New York State. Therefore, surface discharges would come under the jurisdiction of [DEC] and surface discharges would be regulated under [SPDES].

Dkt. No. 119, Exhibit 4: EPA Class IID Permit Responsiveness Summary. *See also* Dkt. No. 112, Exhibit 6: EPA Class III Permit Responsiveness Summary at 832385 ("Discharge of brine into the Cohocton River is outside the jurisdiction of EPA's Underground Injection Control program and is covered by the [DEC].")

Hence, because these two statutes are intended to be implemented concurrently, enforcement of one statute cannot be said to be an obstacle to the other. *NY State Dept. of Soc. Services v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973) ("Where coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one."). *See also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 130, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). In light of this scheme of regulatory authority, state law is not in conflict and not preempted.

### (c) FERC regulation

Bath also contends that FERC has exerted jurisdiction over the facility, therefore preempting DEC in its entirety. Specifically, because FERC has asserted jurisdiction, the provisions of the NGA and NGPSA govern regulation at the Bath facility. DEC argues that FERC does not have jurisdiction in this matter, and even if it does, DEC is not preempted by the NGA and NGPSA.

### 1. The CNG lease agreement for the storage of natural gas

In 1996, Bath entered into a lease agreement with CNG Transmission Corporation ("CNG") to convert part of the facility into one for the storage of natural gas. In May 1996, CNG applied to FERC for a certificate of public necessity to operate a natural gas storage facility on site. In a September 10, 1996 letter Kevin Madden, Director of FERC's Office of Pipeline Regulation, informed the parties that the proposed plan to convert the facility to

store natural gas was subject to FERC jurisdiction.[6] The CNG lease and conversion project was subsequently cancelled. The parties dispute whether FERC has "continuing jurisdiction" over the facility even though there are no current plans to convert it into one for the storage of natural gas.[7] Bath argues that DEC is preempted in its entirety because the FERC asserted jurisdiction over the facility in 1996, and that jurisdiction never ceased because Bath intends to convert the facility in the future. DEC argues that because there is no on-going project, FERC no longer retains jurisdiction, making NGA and NGPSA inapplicable to Bath's facility and unable preempt the state's regulatory authority.

### 2. FERC jurisdiction over the facility

In its September 10, 1996 letter, the FERC explained that "the construction of facilities which are ultimately intended for use in the interstate storage or transportation of natural gas are subject to jurisdiction of the Commission." For this proposition, the FERC relied on the case of *Petal Gas Storage Co.*, 64 FERC ¶ 61,190, 1993 WL 292501 (1993), as Bath does now.

 *Petal Gas* does not stand for the proposition that once FERC asserts jurisdiction it may continue indefinitely. FERC's *Petal Gas* decision notes that "Petal currently has no contract or lease in place with Chevron to lease any storage capacity in the cavern. Petal expects to enter into such a lease agreement if and when the Commission issues Petal a certificate...." *Petal Gas*, 64 FERC ¶ 61,190, at 62, 570, 1993 WL 292501 (F.E.R.C. 1993). In contrast, Bath has no pending certificate application before the FERC

related to conversion of the facility to one for natural gas storage. (Dkt. No. 122, ¶ 58). It has no pending agreement with a third party to lease storage space; the CNG project that contemplated the storage of natural gas at the Bath facility, and which formed the basis for FERC's jurisdiction, has ceased.

Bath asserts that FERC retains jurisdiction because Bath "does intend, as some future time, to pursue" conversion of the facility into one for natural gas storage. (Dkt. No. 124, at 14). This position is flawed. If such statements were credited, then Bath could essentially guard its facility from state regulation by claiming forever that it has future plans to convert the facility to one for natural gas storage, without ever acting on those plans.

Cases holding FERC jurisdiction proper under NGA and NGPSA have involved regulation of facilities that currently stored natural gas. *See, e.g., Public Serv. Comm'n of N.Y. v. Fed. Power Comm'n*, 543 F.2d 757 (D.C.Cir.1974); *Mobil Oil Exploration & Producing Southeast, Inc. v. United Distribution Companies*, 498 U.S. 211, 111 S.Ct. 615, 112 L.Ed.2d 636, (1991) (Explaining that § 7(b) of NGA prohibits a natural gas producer from abandoning its contractual obligations without first obtaining FERC permission to do so). FERC jurisdiction has been rejected where the facility does not store natural gas. *See, e.g., Public Serv. Comm'n of N.Y. v. Fed. Power Comm'n*, 543 F.2d 392 (D.C.Cir.1976) (rejecting jurisdiction of Federal Power Commission [now FERC] because company was storing only synthetic, and not natural, gas).

---

**6.** The September 10 letter from Mr. Madden is Exhibit C to the Affidavit of Robert V.H. Weinberg. The affidavit of Mr. Weinberg is Exhibit 1 of the Plaintiffs' Statement of Material Facts (Dkt. No. 112).

**7.** Bath concedes that it has no present plan to pursue natural gas storage at the facility. (Dkt. No. 122, at ¶ 55).

Without an application pending with the FERC evidencing a plan to store natural gas, the FERC does not retain jurisdiction over the Bath facility and the NGA and NGPSA are presently inapplicable.

### (d) DEC's authority under the statute

■ Bath also argues that even if the state is not preempted, New York is unlawfully enforcing its permit requirements as to Bath on an ad hoc basis because there are no regulations relating to solution mining, nor are there regulations that would authorize the DEC to require sonar testing of salt caverns. (Dkt. No. 124, at 3–5; Dkt. No. 112, ¶¶ 25—28). Bath states that the purpose of sonar testing is to determine the size and shape of the caverns, (Dkt. No. 112, ¶ 22), which determination Bath has argued falls solely within the purview of the EPA. DEC relies on ECL 23–1301 for its authority:

Title 13–UNDERGROUND STORAGE OF GAS

**§ 23–1301. Procedure for obtaining underground storage permit**

No underground storage reservoir shall be devoted to the storage of... [LPG] unless the prospective operator of such storage reservoir shall have received from [DEC]... an underground storage permit.... The application for said permit shall include the following:

(a) A map showing the location and boundaries of the proposed underground storage reservoir.

(b) A report containing sufficient data to show that the reservoir is adaptable for storage purposes.

. . .

(d) Such other information as the department may require.

DEC argues that sonar surveys provide information that Bath must provide to comply with ECL 23–1301 which outlines the procedural requirements for obtaining a permit to store LPG in modified caverns.

Specifically, the sonar surveys "provide information necessary for an underground storage reservoir map and reservoir suitability report required by ECL 23–1301(a) and (b). Such map and report demonstrate the ability of caverns to safely store gas." (Dkt. No. 116, ¶ 22).

In reviewing state legislation, courts have acknowledged that "[w]hen the purpose of the statute is specific, it is unnecessary for an agency to promulgate formal rules or regulations as long as the intent of the statute is effected." *Ellis Ctr. for Long Term Care v. DeBuono,* 261 A.D.2d 791, 795, 694 N.Y.S.2d 177 (App.Div.3d Dept.1999). *See also O'Neil v. Metropolitan Tr. Auth.,* 143 A.D.2d 739, 740, 533 N.Y.S.2d 450 (App.Div.2d Dept.1988), *appeal dismissed,* 74 N.Y.2d 909, 549 N.Y.S.2d 957, 549 N.E.2d 148 (holding that statute making it unlawful to smoke tobacco on mass transportation required no regulations).

In *Occidental Chemical Corporation v. New York State Environmental Facilities Corporation,* 113 A.D.2d 4, 494 N.Y.S.2d 517 (3d Dept.1985), *leave denied,* 67 N.Y.2d 604, 500 N.Y.S.2d 1025, 490 N.E.2d 1231, the State denied a corporation financing related to chemical waste monitoring. The state statute gave the agency authority to "deny any application 'for any reason it deems appropriate in the public interest'." *Id.* at 5–6, 494 N.Y.S.2d 517. The corporation argued that the agency acted arbitrarily and capriciously in denying the application on this "public interest" ground, because it had no guidelines to establish what that term meant. *Id.* at 6, 494 N.Y.S.2d 517. In explaining that no regulations were required, the court instructed:

[I]t is well established that if the criterion of "public interest" is directly related to and limited by the general purpose of the legislation itself, that is a sufficient

guide for agency action.... The declared policy of the Legislature in authorizing respondent to extend credit to enterprises making the capital outlay to comply with the State's environmental laws is to control and prevent pollution of the air, land and waters of the State.... As the purpose of [the law] is thus quite specific, all that is required of respondent to effect this mandate in any particular instance is conformity with the statutory language and policy.... [T]here is no constitutional compulsion... to translate the Legislature's standards into formal and detailed rules of thumb prior to applying them to [this] case.

*Id.* (internal citations omitted).

*Occidental* is instructive. In the present case, the statute's purpose is clear: regulate LPG's underground storage to protect landowners' rights and the general public. *See* ECL 23–0301. With this specific directive, the discretion of the DEC is not unbridled. As this Court has said:

Under New York State Environmental Conservation Law, the [DEC] was entitled to ask Plaintiffs for "such other information as the department may require" when it ruled on their permit application. *See* N.Y.Envtl.Conserv.Law § 23–1301(1)(d) (McKinney 1997). Whether the Departments' request for sonar testing was within its discretion under this or another section of New York State's Environmental Conservation Law, the Court does not hazard a guess. Suffice it to say, it is at least arguable, if not highly likely, that the Department of Environmental Conservation acted within its discretion when ordering Plaintiffs to provide it with this information. *Bath Petroleum Storage, Inc. v. Sovas,* 136 F.Supp.2d 52, 59–60 (N.D.N.Y.2001) (rejecting Bath's allegation that DEC officials violated Bath's due process rights when they re-

quired sonar surveys for an Article 23 permit).

The legislature saw fit to give DEC authority to require any information it may need in assessing an application for a LPG storage permit. It is within the DEC's discretion under ECL 23–1301 to require sonar surveys, and as DEC did not abuse its discretion, this Court will not reconsider that decision.

### (e) Enforcement Action

 Finally, Bath objects to DEC's administrative enforcement action which in Counts Nine through Fifteen alleges that Bath expanded six of its caverns without the appropriate state permit.

The parties agree that the EPA Class III permit allows Bath to expand the caverns to a diameter of 200 feet and contemplates the use of fresh water to solution the caverns. Therefore, Bath argues that this enforcement action, which is premised on the enlargement of the caverns being violative of state law, is preempted. DEC argues that the administrative enforcement proceeding is "wholly independent of plaintiffs' UIC permits and former gas conversion project" because it "concerns plaintiffs' violations of the ECL and applicable regulations regarding their 1992 ECL article 23 permit, a former SPDES permit, and expansion activities without a permit." (Dkt. No. 118, at 23).

For the reasons explained above, DEC has authority to regulate the SPDES program, and as such it is not preempted from bringing an enforcement action pursuant to that authority.

Furthermore, as explained above, DEC may regulate the underground storage of LPG pursuant to ECL Article 23. While DEC cannot regulate the expansion of the caverns, regulation of the resulting modi-

fied structure, i.e. the newly formed caverns, for the storage of LPG is within the purview of DEC pursuant to Article 23. Additionally, modifications of caverns that will be used to store LPG is within the jurisdiction of DEC. Therefore, DEC is not precluded from bringing an enforcement action pursuant to the authority.[8]

## III. CONCLUSION

For the reasons set forth above, it is hereby

ORDERED, that Plaintiffs' motion for reconsideration is **DENIED**; and it is further

ORDERED, that Plaintiffs' motion for summary judgment is **DENIED**; and it is further

ORDERED, that Defendant's motion for summary judgment is **GRANTED**; and it is further

ORDERED, that the case is **DISMISSED**; and it is further

ORDERED, that the Clerk serve a copy of this order on all parties.

IT IS SO ORDERED.

---

**8.** The Court will not consider the merits of DEC's action except to say that it is not preempted.